# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3130NE

_____

| | | |
|---|---|---|
| John Gebhardt, Individually and on behalf of all others similarly situated; Jemmco Investment Management; and Plumbers & Pipefitters National Pension Fund, | * * * * * * * | |
| Appellants, | * * | On Appeal from the United States District Court |
| v. | * * | for the District of Nebraska. |
| ConAgra Foods, Inc.; Bruce C. Rohde; James P. O'Donnell; Kenneth W. Difonzo; and Jay D. Bolding, | * * * * * | |
| Appellees. | * | |

_____

Submitted: April 17, 2003
Filed: June 30, 2003

_____

Before BOWMAN, RICHARD S. ARNOLD, and BYE, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.


United Agri Products, a wholly owned subsidiary of ConAgra Foods, Inc., engaged in misleading accounting practices throughout the late 1990s. John Gebhardt, on behalf of a class of investors who bought ConAgra stock between

August 28, 1998, and May 23, 2001, filed an action against ConAgra and its management under the Securities Exchange Act of 1934 to recover for the fraud allegedly perpetrated by ConAgra's subsidiary with the help or knowledge of the defendants. The District Court dismissed the plaintiffs' suit for failing to state a claim upon which relief could be granted for two reasons: (1) the defendants' misrepresentations were immaterial as a matter of law; and (2) the plaintiffs suffered no loss attributable to the defendants. We disagree as to both conclusions and reverse the judgment of the District Court.

I.

ConAgra concedes that the management of its subsidiary, UAP, began to overstate UAP's earnings. The complaint alleges that throughout the fiscal years 1998, 1999, and 2000, UAP recognized sales when delivery of the goods had not yet taken place — a violation of generally accepted accounting principles (GAAP). UAP also recorded rebates as income in violation of GAAP and made "sales" to non-existent customers. The subsidiary also boosted its bottom line by maintaining inadequate reserves for bad debts and delaying the writing off of uncollectible accounts receivable. Roughly $287 million in revenue was manipulated over the three years at issue. This caused all of UAP's, and hence ConAgra's, earnings statements, usually in the form of 10-K or 10-Q filings with the SEC, to be overstated. Certain ConAgra officers were allegedly aware of UAP's fraud and either encouraged it or turned a blind eye to it.

In February of 2001, ConAgra made the first of two press statements which would play prominent roles in this suit. The company announced that it was expecting reduced profits for the second half of 2001 on account of a tougher business climate. Of special significance to this case was an innocuous-sounding statement at the end of the release noting that the reduced expectations did not take into account the "impact of accounting changes which the company is currently

-2-

reviewing." In the wake of this news, ConAgra's stock plummeted from $24.86 to $20.01 per share. The plaintiffs allege that this seemingly unrelated announcement was made with the UAP scandal in mind. They argue that the final line of the statement tipped off knowledgeable investors to ConAgra's accounting difficulties, and was made in order to take some of the sting out of the upcoming second announcement.

Three months later, on May 23, 2001, ConAgra announced that, because of UAP's subterfuge, it was going to have to restate its earnings, both past and present. In the announcement, Bruce Rohde, ConAgra's CEO and a defendant in this case, said, "[c]ertain matters were discovered that warranted an investigation into several accounting practices at UAP. Our preliminary findings indicate that certain conduct at UAP circumvented generally accepted accounting practices and violated ConAgra Foods' corporate policy. Those actions will not be tolerated." Most of UAP's fraud involved recognizing income prematurely, so the problem was mostly one of having the money attributed to the wrong year, as opposed to not having ever made the money at all. Consequently, ConAgra's income, before taxes, was reduced by $111 million for the years 1998 through 2000, while its income for 2001 was increased by $127 million.[1] The company's stock dropped from $20.61 to $20.07 on heavy trading the day after the May announcement. However, the stock price quickly recovered and began to trend higher. Its average closing price during the 90 days following was a few cents higher than the stock's price on the day of the May announcement.

By August, purchasers of ConAgra stock had filed suit against the company. On January 11, 2001, the District Court appointed lead plaintiffs in this case and allowed the investors to file an amended class-action complaint that alleged ConAgra

---

[1]Additional revenues from 1997 were shifted to 2001, which explains why profits increased in 2001 more than they decreased for the years 1998 through 2000.

had knowingly or recklessly misrepresented its financial results for the years in question in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). The class period began on August 28, 1998, when ConAgra filed its Form 10-K for 1998 with the SEC, and ran until May 23, 2001, when ConAgra fully revealed its accounting problems. The plaintiffs also claimed that the managers of ConAgra — Bruce Rohde, James O'Donnell, Kenneth DiFonzo, and Jay Bolding — were liable as controlling persons under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).

In response, ConAgra filed a 12(b)(6) motion to dismiss. The plaintiffs suggested in a brief that they should be granted leave to amend their complaint should any part of it be dismissed. The District Court did not address the amendment issue; instead, the Court dismissed plaintiffs' complaint because, in the Court's view, the plaintiffs failed to allege either transaction or loss causation, both being essential elements of a 10(b) lawsuit. Arthur Young & Co. v. Reeves, 937 F.2d 1310, 1327-28 (8th Cir. 1991).

With regard to transaction causation (which can be thought of as reliance), the District Court noted that the amount of earnings misrepresented was merely 0.4 per cent. of ConAgra's total revenues during the years in question. Further, this money was earned by the company; ConAgra merely reported it prematurely. The Court concluded that "[a] reasonable investor with complete knowledge of the UAP accounting issues would have realized that ConAgra's overall earnings were basically unaffected by any of those issues." Dist. Ct. Op. 11. This conclusion set off a chain of legal conclusions: without a material misstatement, the plaintiffs could not invoke

the fraud-on-the-market theory,[2] and without that theory, they had not shown transaction causation, an essential element of their claim.

The District Court also held that the plaintiffs' pleadings failed to allege loss causation. The plaintiffs alleged that UAP's accounting had artificially inflated the value of ConAgra's stock and thus the plaintiffs paid too much for it and suffered damages. However, because the misrepresentations had been immaterial, the District Court reasoned, it followed that ConAgra's stock was not affected by the misrepresentations and hence was not inflated. The District Court buttressed this conclusion with the fact that the stock's price was virtually unaffected by the May announcement, which suggested that most investors were not concerned about the earnings restatement. The District Court declined to attach any significance to the February decline because that "announcement had no possible connection to the UAP accounting issues." Plaintiff's other cause of action, the Section 20(a) claim, relied on the 10(b) action, and the dismissal of that action necessarily resulted in the dismissal of the other. After having all of their claims dismissed, the plaintiffs filed a timely appeal to this Court.

II.

We review the District Court's grant of a 12(b)(6) motion to dismiss de novo. Romine v. Acxiom Corp., 296 F.3d 701, 704 (8th Cir. 2002). Our review is stringent — we will affirm only if the plaintiffs can prove no set of facts that would entitle them to the relief requested. Id. We have said, "as a practical matter, dismissal under

_____

[2]In fraud-on-the-market cases, "causation is not premised on any specific transaction between plaintiff and defendant . . .. Causation lies in the fact that the plaintiff relied on the market price of the security as an indicator of the future value of the stock. To the extent that the defendant's misrepresentations artificially altered the price of the stock and defrauded the market, causation is presumed." In re Control Data Corp. Sec. Litig., 933 F.2d 616, 619-20 (8th Cir. 1991).

Rule 12(b)(6) is likely to be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997). We will assume the facts pleaded are true and will construe those facts in the light most favorable to the plaintiffs. United States v. Aceto Agr. Chemicals Corp., 872 F.2d 1373, 1376 (8th Cir. 1989). After viewing the facts in this light, we respectfully disagree with the District Court's decision.

## A.

We first address the materiality of UAP's misrepresentations. A fact is deemed material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as substantially altering the mix of information available to the investor. Parnes, 122 F.3d at 546, citing Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). Ordinarily, materiality is a question of fact for the jury; however, we have recognized an exception in cases where the false information is so insignificant, in relation to the total mix of data available, that it would not have mattered to a reasonable investor. Parnes, 122 F.3d at 547.

We addressed the propriety of deciding materiality as a matter of law in Parnes v. Gateway 2000, Inc., supra, in which we affirmed the grant of a motion to dismiss a 10(b) claim. The defendant in Parnes overstated its assets by $6.8 million. We observed that the information misrepresented was insignificant because of its context — the investment at issue was a rapid-growth company that presented investors with great risk and great opportunity for reward. Id. at 547. In the present case, the defendants overstated their revenues by roughly forty times as much. However, any comparison of quantitative measures, either in ConAgra's or the plaintiffs' favor, misses the lesson of Parnes. The question of materiality hinges on the particular circumstances of the company in question; and that is what we now discuss.

The plaintiffs argue that ConAgra's restating of revenues is a strong indicium of materiality. They note that if the misrepresentation was significant enough to warrant a press release and the filing of amended earnings statements with the SEC, then surely it would be of at least some interest to a reasonable investor. We are inclined to agree to a limited extent. We do not believe that restating earnings makes the original misstatement material per se, especially in cases where the company is required to restate its earnings no matter how small the discrepancy. However, those facts are part of the total mix of information available to investors and are deserving of some consideration.

Another piece of the mix is the concern that these actions raise about the management of ConAgra. Plaintiffs assert that the information was material because a reasonable investor would be interested in knowing that, at worst, the senior managers of ConAgra were in league with the deceptive management of UAP or, at best, were oblivious to their underlings' malfeasance.[3] Management's integrity would probably be important to investors.

The keystone of plaintiffs' materiality argument is their allegation that UAP's misrepresentations caused ConAgra to appear to be earning more than it was. They said, "[t]hese material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of ConAgra and its business . . .." Appellant's App. 41. Most investors would consider it significant, no

---

[3]Defendant relies on the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (1995). See 15 U.S.C. § 78u-4(b)(2) ("the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."). The new statute's heightened scienter requirement is not involved in this appeal. The District Court never reached the question of scienter, and neither do we. The complaint's allegations of misconduct are involved here only as they relate to the questions of materiality and loss causation. The new statute does not change traditional pleading rules with respect to these issues.

matter what the mix of information available, that a company was not earning as much as it was claiming to earn. The onus is on the defendants to demonstrate why this assumption should not stand. They attempt to do so with two arguments. The defendants say that a reasonable investor would not care about the misrepresentations because the amount of money in question is insignificant relative to the company's size, and because the earnings misrepresented were, for the most part, received by the company — just not at the time the company initially claimed.

In addressing the circumstances of this case, the District Court held that "[i]n the total mix of information available to investors, the mere fact that ConAgra's revenues were overstated by 0.4 per cent. during fiscal 1998-2000 was immaterial as a matter of law," and determined that the question of materiality could be decided against the plaintiffs as a matter of law. Dist. Ct. Op. 11. In our view, the quantity of a revenue overstatement, in and of itself, is not sufficient to be dispositive of this issue. Instead, we look at the total mix of data available to investors, and place the misrepresented data in context. More than a revenue loss was involved here. There was also a loss in net income, a figure that may be of more significance to investors. Here, the complaint alleges that ConAgra overstated its net income for 1999 and 2000 by 8 per cent. It is hard to say that a discrepancy of this magnitude is immaterial as a matter of law. In order to take this decision away from the jury, the circumstances must make it obvious why a reasonable investor would not be concerned about the facts misrepresented. In Parnes, we found it rational to conclude that investors attracted to an investment with high risk and the potential of high return are not going to be fazed by a small increase in risk. 122 F.3d at 547. No such circumstances are obvious in this case, and they rarely will be at the pleadings stage.

ConAgra also argues that the misrepresentations in question were not material because they related to the timing of revenue recognition rather than to its earning. The District Court reasoned that since the money was ultimately earned, a reasonable investor would not care whether it was attributed to one year versus another. But the

importance of the misrepresented facts should not be judged with the advantage of hindsight. Our test is whether there is "a substantial likelihood that the disclosure of the omitted fact *would have been viewed* by the reasonable investor as having significantly altered the total mix of information made available." Rodney v. KPMG Peat Marwick, 143 F.3d 1140, 1144 (8th Cir. 1998) (quotations omitted) (emphasis added). This requires us to look at the information from the perspective of a reasonable investor at the time of the misrepresentation, not from the perspective of a reasonable investor looking back on how events unfolded.

We keep in the forefront of our minds that fact that "[j]ust because a hidden risk does not materialize doesn't mean its concealment cannot hurt investors." Id. In this case, UAP could not know for certain that it would receive the profits that it had booked. It is fortunate for ConAgra that the economy held up during the time in question, and that UAP was able to deliver as promised. That outcome may be relevant to damages, but it is not necessarily controlling on the question of materiality. At a later stage of the case, either on motion for summary judgment or after trial, the fact that the overstated income ultimately did materialize could well prove important. Certainly an income overstatement that is made up for, so to speak, in a later year could be viewed as less important by an investor. This factor alone, however, in our view, is not sufficient to defeat this case at the stage of a motion to dismiss for failure to state a claim.

B.

The District Court also ruled that the plaintiffs failed to satisfy the loss causation element of their claim. They pleaded that "the market for ConAgra's common stock promptly digested current information regarding ConAgra from all publicly available sources and reflected such information in ConAgra's stock price. Under these circumstances, all purchasers of ConAgra's common stock during the

Class Period suffered similar injury through their purchase of ConAgra's common stock at artificially inflated prices . . .." Appellant's App. 57.

This was not sufficient, according to the District Court, because the market would not rely on immaterial information and therefore the stock price could not have been inflated due to the false information. In Part II(A) of this opinion we explained why we believe the misrepresented facts were material. Our finding of materiality allows the plaintiffs to invoke the fraud-on-the-market theory and assume that the misrepresentations inflated the stock's price. Paying more for something than it is worth is damaging. Thus, the plaintiffs adequately pleaded their case for damages.

Moreover, our causation requirement for damages is not very stringent. See In re Control Data Corp. Sec. Litig., 933 F.2d 616, 619 (8th Cir. 1991) ("Plaintiffs are not required to meet a strict test of direct causation under Rule 10b-5; they need only show 'some causal nexus' between . . . improper conduct and plaintiff's losses."). The plaintiffs also demonstrated loss causation by pleading that a decline in the value of their stock was related to UAP's accounting issues. See Arthur Young & Co., 937 F.2d at 1332. They did plead this, and the stock declined by roughly 4 per cent. the day after the May announcement. This was a sufficient allegation of a causal link between the company's misbehavior and a subsequent decline, though it was a modest one.

ConAgra argues that since its stock's value increased in the weeks after the May announcement the plaintiffs can show no connection between the misrepresentations and any loss. However, stockholders can be damaged in ways other than seeing their stocks decline. If a stock does not appreciate as it would have absent the fraudulent conduct, investors have suffered a harm. Therefore, we decline to attach dispositive significance to the stock's price movements absent sufficient facts and expert testimony, which cannot be considered at this procedural juncture, to put this information in its proper context.

Taking everything the plaintiffs pleaded as true, as we must, the plaintiffs have stated facts sufficient to demonstrate loss causation.

## III.

In conclusion, we believe that the District Court erred in deciding on a motion to dismiss that the plaintiffs had failed to plead either transaction or loss causation. A reasonable investor might be concerned about one of ConAgra's subsidiaries reporting earnings not yet received, especially if this was done under orders from ConAgra's senior management. The fraud-on-the-market theory then would allow the fact finder to presume that the stock's price reflected the inflated earnings, and it makes sense to conclude that the plaintiffs were harmed when they paid more for the stock than it was worth. This is a sufficient allegation.

For these reasons, the judgment of the District Court is reversed, and this case is remanded to that Court for further proceedings not inconsistent with this opinion.[4]

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[4]We have before us a motion by the plaintiffs to strike certain material in the defendants' appendix. We have not relied on these materials, and they have not affected the outcome of this appeal. The motion to strike is therefore denied as moot. In addition, we have held that the version of the Amended Complaint that was before the District Court is sufficient to withstand a motion to dismiss under Rule 12(b)(6). It is therefore unnecessary to decide whether the District Court should have granted leave to amend the complaint further.