In Re XCEL ENERGY, INC.,
Securities, Derivative &
"ERISA" Litigation

This Document Relates to Case Numbers: 02–2677, 02–2774, 02–2787, 02–2832, 02–2889, 02–2921, 02–2933, 02–3053, 02–3508, 02–3574, 02–3715, 02–3755, 02–3798, the "Securities Actions".

Nos. CIV.02–2677 DSD/FLN,
MDL NO. 1511.

United States District Court,
D. Minnesota.

Sept. 30, 2003.

Garrett D Blanchfield, Jr, Reinhardt Wendorf & Blanchfield, St Paul, MN, Jeffrey D. Bores, Karl L. Cambronne, Jack L. Chestnut, Chestnut & Cambronne, Minneapolis, MN, Martin D. Chitwood, Chitwood & Harley, Atlanta, GA, Christine M Fox, Frederic S Fox, Kaplan Fox & Kilsheimer, New York, NY, Carol V Gilden, Much Shelist Freed Denenberg Ament & Rubenstein, Chicago, IL, Daniel E. Gustafson, Gustafson Glueck, Minneapolis, MN, Samuel D. Heins, Heins Mills & Olson. Minneapolis, MN, Stacey L Mills, Heins Mills & Olson, Minneapolis, MN, Robert M Roseman, Eugene A. Spector, Spector Roseman & Kodroff, Philadelphia, PA, Jay P Saltzman, Schoengold & Sporn, New York, NY, Sherrie R Savett, Berger & Montague, Philadelphia, PA, Joel B Strauss, Kaplan Fox & Kilsheimer, New York, NY, for plaintiffs.

James L Altman, Xcel Energy, Minneapolis, MN, Thomas J Basting, Jr, Timothy Robert Thompson, Briggs & Morgan, Minneapolis, MN, Michael Charles Krikava, Briggs & Morgan, Minneapolis, MN, Andrew Luger, William J. Otteson, Greene Espel, Minneapolis, MN, Eric John Magnuson, Rider Bennett, Minneapolis, MN, John M. Newman, Jr., Geoffrey J. Ritts, Joshua M. Ryland, Jones Day, Cleveland, OH, Richard Gregory Wilson, Maslon Edelman Borman & Brand, Minneapolis, MN, for defendant.

Carolyn Glass Anderson, Zimmerman Reed, Minneapolis, MN, Andrew L Barroway, Stuart Berman, Darren J. Check, Schiffrin & Barroway, Bala Cynwyd, PA, Harvey H. Eckart, Eckart Law Office, St. Paul, MN, Bruce G Murphy, Murphy Law Offices, Vero Beach, FL, Randall K Pulliam, Cauley Geller Bowman & Coates, Little Rock, AR, J Gordon Rudd, Jr, Zimmerman Reed, Minneapolis, MN, Vernon Jay Vander Weide, Head Seifert & Vander Weide, Minneapolis, MN, for movants.

Michael J Beck, Clerk of the Panel, Washington, DC, pro se.

## ORDER

DOTY, District Judge.

This matter is before the court upon the motions of defendants Xcel Energy, Inc. ("Xcel"), James J. Howard ("Howard"), Wayne H. Brunetti ("Brunetti"), Edward J. McIntyre ("McIntyre"), William T. Pieper ("Pieper"), Gary R. Johnson ("Johnson") and Richard C. Kelly ("Kelly") to dismiss the Second Corrected First Amended Consolidated Complaint ("consolidated complaint") pursuant to Fed. R.Civ.P. 9(b) and 12(b)(6), and defendants David H. Peterson ("Peterson"), Leonard A. Bluhm ("Bluhm") and Luella G. Goldberg ("Goldberg") to dismiss Counts III, IV and V of the consolidated complaint pursuant to Fed.R.Civ.P. 12(b)(6). For the following reasons, defendants' motions are granted in part and denied in part.

## BACKGROUND

The motions before the court concern the claims of two of four groups of plaintiffs in this consolidated multi-district litigation ("MDL") putative class action. The plaintiff groups targeted by the motions to dismiss are the Chips group, representing named and putative class plaintiffs consisting of owners of Xcel securities who allege securities fraud against Xcel, Howard, Brunetti and McIntyre and controlling personal liability against Howard, Brunetti and McIntyre under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and the Catholic Workman group consisting of named and putative plaintiffs in a subclass of persons who purchased or acquired NRG Senior Notes and who allege false and misleading statements in a Registration Statement or Prospectus under § 11 and joint and several liability under § 15 of the Securities Act of

1933 (the "Securities Act") against Peterson, Bluhm and Goldberg and securities fraud against all defendants under § 10(b) of the Exchange Act.

The claims set forth in the consolidated complaint arose out of Xcel's relationship with its subsidiary, NRG Energy, Inc. ("NRG"), as well as dealings between Xcel's subsidiary Public Service Company of Colorado ("PSCo") and competitor Reliant Resources, Inc. ("Reliant"). Plaintiffs allege that defendants misrepresented the nature of the relationship between Xcel and NRG by withholding material information about the existence of cross default covenants in Xcel's credit facilities. Plaintiffs contend that defendants' intentional failure to disclose the cross default provisions, particularly in light of certain statements made by defendants, caused the market to overvalue Xcel shares and NRG notes by masking a significant risk created by the covenants. Plaintiffs also allege that defendants intentionally withheld information pertaining to "round trip trades" or "wash sales" between PSCo and Reliant that also caused the market to overvalue Xcel shares and NRG notes.[1] The consolidated complaint claims that these events occurred during the alleged class period, from January 31, 2001 through July 26, 2002.

Because the motions before the court challenge the validity of the claims under Fed.R.Civ.P. 9(b) and 12(b)(6), the court considers and now recites the facts as they are alleged in the consolidated complaint.

## A. The Parties

Defendant Xcel is a Minnesota corporation based in Minneapolis, Minnesota that provides electricity and natural gas to residential and commercial customers in twelve western and midwestern states through its regulated utilities companies. NRG, an independent power producer ("IPP") dealing in the production and wholesale marketing of energy, is a subsidiary corporation of Xcel. Xcel maintained a controlling interest in NRG at all times relevant to the present action, holding from approximately seventy-five to over ninety percent of all outstanding shares and well over ninety percent of the total voting rights in NRG.

Xcel and NRG shared a number of officers and directors. During the relevant time period Howard was chairman of Xcel's board of directors and a director. He was also an NRG director and was a signatory to NRG's Registration Statement and Prospectus pertaining to the public offering of the NRG notes that are the subject of Catholic Workman's claims. Johnson was an NRG director and vice president and general counsel of Xcel. Johnson also signed NRG's Registration Statement and Prospectus. Kelly was an NRG director and became acting president and chief operating officer ("COO") of NRG in June 2002. He is also president of Xcel. Kelly also signed NRG's Registration Statement and Prospectus. Kelly replaced Brunetti, who had been Xcel's president and chief executive officer ("CEO") and who became chairman and CEO of NRG. McIntyre was Xcel's vice president and chief financial officer ("CFO") and an NRG director. He assumed responsibility for NRG's finances in June 2002. Peterson was variously chairman, CFO, president and a director of NRG during the relevant time period. He also signed the NRG Registration Statement and Prospectus. Peterson resigned on June 3, 2002. Bluhm was executive vice president and

---

1. Round trip or wash sales occur when an energy producer or wholesaler purchases energy and then sells it back at the same price. Round trip trades are considered sham transactions because they artificially inflate sales revenue for each company without impacting profitability.

CFO of NRG and he also signed the NRG Registration Statement and Prospectus. Bluhm also resigned on June 3, 2002. Pieper was NRG's controller and he signed the NRG Registration Statement and Prospectus. Goldberg was an NRG director during the relevant time period and she also signed the NRG Registration Statement and Prospectus relative to the NRG Senior Notes.

In addition to Xcel's majority ownership of NRG and the common officers and directors, Xcel provided administrative support to NRG. Those services included benefits administration, engineering and accounting support, as well as other shared services. NRG employees also participated in certain Xcel employee benefit plans.

The Chips group consists of named plaintiffs Chips Investments Limited Partnership, Steven Aanenson, Beverly K. Aanenson, Harry C. Andrews, Thomas R. Perry, Jr., Lloyd & Barbara Amundson Charity Foundation, Lake Benton Bancorporation, Inc. and L.A. Amundson Scholarships, Inc. and members of a putative class of persons who purchased or acquired Xcel securities during the class period.[2]

Named plaintiff Catholic Workman is a non-profit fraternal benefit society representing a subclass of putative plaintiffs who purchased or acquired NRG 7.75% Senior Notes or 8.625% Senior Notes offered pursuant to a Registration Statement and Prospectus filed by NRG in January, 2001.

## B. The Rise and Fall of NRG

Throughout 2000 and 2001, NRG embarked on an aggressive growth and acquisition plan. After its initial public offering ("IPO") in May, 2000, NRG acquired approximately $2 billion in assets, net of liabilities, while issuing approximately $3 billion in long-term debt. NRG continued its expansion in 2001, making additional acquisitions and capital expenditures while incurring significant additional debt. Xcel made significant investments in its subsidiary. However, NRG's equity position did not keep pace with its increased liabilities. As a result of NRG's poor debt to equity ratio, analysts placed its debt issues on credit watch in November of 2001. NRG's credit agreements required that if its debt rating was downgraded to below investment grade, NRG would be forced to post cash collateral of nearly $1 billion. Because of its liquidity problems, it was not likely NRG would have sufficient cash available to meet the collateral requirement if it became necessary. As NRG's liquidity problems worsened, the market began showing signs of reduced confidence in the IPP sector as a whole.

Xcel announced that it would commit $600 million to assist its struggling subsidiary. Analysts responded by putting Xcel on credit watch. Xcel also announced a tender offer to acquire outstanding shares of NRG stock through an Xcel for NRG stock swap plan, offering NRG shareholders a fifteen percent premium based on the current market prices for the two securities.

The IPP industry and NRG in particular continued to struggle. Between January and April 2002, NRG abandoned its aggressive growth plan, announcing reductions in planned capital expenditures and a plan to divest various assets. Xcel provided $470 million to NRG in March and April of 2002, to help with its ongoing cash problems. In spite of those efforts, NRG's difficulties continued. In June 2002, Xcel made a number of management personnel changes at NRG. Nonetheless, analysts re-

2. In accordance with 15 U.S.C. § 78u–4, the Chips group has been named lead plaintiff for the consolidated securities action. (*See* Pretrial Order No. 1, dated November 12, 2002.)

duced the rating on Xcel's credit and commercial paper, citing risks to Xcel brought on by its struggling subsidiary, NRG.

On July 25, 2002, after the close of the market, Xcel released its second quarter results. It also made public for the first time the existence of cross default provisions in Xcel's credit facilities. Xcel disclosed that if NRG was downgraded to junk status and was unable to post a sufficient cash collateral, NRG would be in default of its credit agreements. It further acknowledged that, due to the cross default provisions, an NRG default would put Xcel in default and could cut off Xcel's access to its own lines of credit. On that news, Xcel stock suffered a one-day drop in price of approximately thirty-six percent on July 26, 2002. Not surprisingly, the NRG notes followed a similar pattern. They had traded essentially in tandem with Xcel stock. When the cross default provisions were revealed, the notes lost between six and one half and seven and one half percent in value. After the market closed July 26, 2002, analysts dropped NRG's credit rating to below investment grade.

NRG and its subsidiaries later defaulted on several of their debt obligations and a petition for involuntary bankruptcy was filed. Xcel ultimately took a loss of over $2 billion on its NRG investment. It was also forced to renegotiate its own credit facilities on less favorable terms, eventually paying off and closing one of the $400 million credit agreements. Xcel's directors also cut the annual dividend in half.

## C. The Cross Default Provisions

In November of 2000, Xcel had established two $400 million credit facilities, one on a five year term and the other on a 364 day term. Each of the credit agreements contained the cross default provision, which stated that Xcel would be in default if any Xcel subsidiary defaulted on a note with a principal balance more than $50 million. Thus, if NRG or any Xcel subsidiary failed to make a payment on a note of over $50 million, Xcel would be in default, could face acceleration of its loans and conceivably lose access to its credit facilities. That was significant because NRG's credit agreements called for cash collateral in the event of a further rating downgrade. Since NRG did not have sufficient cash available to meet a large collateral requirement, a downgrade could lead to a default. It appeared likely that if a downgrade occurred NRG would look to Xcel for cash assistance, but it was not publically known that Xcel's access to cash would be in jeopardy in that circumstance.

Xcel did not disclose the cross default provisions to either regulators or the investment community until the eve of the analysts' further lowering of NRG's credit and securities ratings to below junk status. On July 25, 2002, Xcel disclosed that if NRG defaulted, Xcel would also be in default under its own credit facilities and could be cut-off from those funds. Xcel also indicated that, in the event of a ratings downgrade, it was unlikely that NRG would be able to post the required cash collateral. The following day, Xcel discussed the potential impact of the cross default provisions with securities and credit analysts, who found the information "[p]articularly troubling," and "a new (and significantly negative) disclosure." (Consol. Compl. at ¶¶ 154, 159.) Analysts downgraded NRG's corporate credit rating from "investment grade" to "junk" status after the close of the market that day. (*See* Consol. Compl. at ¶ 156.) Some analysts also lowered Xcel's credit ratings, as well as those of some of its other subsidiaries. (*See* Consol. Compl. at ¶¶ 163–64.) NRG defaulted on several of its obligations soon thereafter.

Xcel was able avoid a default by renegotiating the terms of its credit facilities so that the cross default provisions were never invoked. In that process, Xcel made concessions which increased its cost of borrowing and otherwise limited its access to funds.

### D. Xcel's Public Statements

Despite the close relationship between Xcel and NRG through Xcel's ownership, management ties, administrative agreements, infusions of capital and the cross default provisions, Xcel repeatedly assured analysts, investors, the Securities Exchange Commission ("SEC") and the Minnesota Public Utilities Commission ("MPUC") that the two entities were sufficiently separate to avoid inordinate risk to Xcel and to satisfy regulatory requirements.

In December 2001, defendant Brunetti reportedly "discounted risk" to Xcel from NRG's liquidity woes. (Consol. Compl. at ¶ 94.) In January 2002, Xcel issued a press release commenting on downgrades to NRG's securities and credit ratings, stating it was committed to credit quality. (*See* Consol. Compl. at ¶ 98.) On that same day, Xcel held a conference call with securities analysts in which defendant McIntyre claimed that Xcel had not entered any commitments of support, recourse or non-recourse, regarding NRG's debts. Xcel assured the analysts that the relationship between it and NRG was structured such that NRG's credit quality was "basically viewed as NRG credit quality" and it stood, "basically on its own merits." (Consol. Compl. at ¶ 100.) In another conference call with analysts the following month, Xcel reiterated its commitment to NRG's bond rating while stating that, in the event of a successful reacquisition of outstanding NRG shares, NRG's debt would remain NRG's and that NRG would remain a separate and distinct entity. (*See* Consol. Compl. at ¶ 108.)

Defendant Brunetti later said that the reacquisition would allow Xcel to "strengthen NRG's balance sheet and manage growth with decreased dependence on external financing." (Consol. Compl. at ¶ 133.)

The next week Xcel issued a Form 8–K statement regarding the possible impact of a downgrade of NRG's debt rating to below investment grade, since that would trigger an obligation for NRG to post nearly $1 billion in cash collateral. Xcel indicated that if a further downgrade were to occur, NRG would meet the collateral obligation through cash on hand, revolving lines of credit, liquidity assistance from Xcel and the possible issuance of additional debt. (*See* Consol. Compl. at ¶ 115.) Xcel made the same statement in its Registration Statement and Prospectus filed with the SEC in conjunction with its exchange offer for the outstanding shares of NRG, in its annual Form 10–K report for year end 2001 and again in its first quarter 2002 10–Q report. (*See* Consol. Compl. at ¶¶ 121, 125, 132.)

Also, after analysts downgraded Xcel and certain Xcel subsidiary securities ratings on the basis of risks related to NRG's liquidity problems, Xcel issued a press release wherein defendant Brunetti claimed that Xcel had ample liquidity through its existing lines of credit. (*See* Consol. Compl. at ¶¶ 140–42.)

Despite Xcel's repeated assurances of sufficient separation, absence of support obligations and sufficient Xcel liquidity, after the banks had agreed to drop the cross default provisions, Brunetti proclaimed that the elimination of the provisions "should make it clear that we have the needed financial and legal separation between NRG and the Xcel holding company," and that the cross default provisions "had constrained Xcel Energy's ability to access capital markets due to NRG's financial condition." (Consol. Compl. at ¶ 166.)

## E. The Round Trip Sales

Immediately after Xcel revealed the existence and possible impact of the cross default provisions, it informed analysts that the SEC and the Commodities Futures Trading Commission ("CTFC") had issued it and others subpoenas in their investigations of the round trip trades between PSCo and Reliant.

On July 29, 2002, the first day after the SEC and CTFC investigations were revealed, the trading price of Xcel shares dropped approximately twenty-five percent. That decline followed the thirty-six percent drop that occurred the previous trading day, July 26, 2002.

## F. Xcel's Dividend

Throughout the class period, Xcel frequently referred to its ongoing commitment to dividend performance. For example, in an April 2001, conference call with analysts, Howard and Brunetti both commented on Xcel's commitment to Xcel's "high dividend yield." (Consol. Compl. at ¶ 80.) In February 2002, McIntyre stated, "[w]e view the annualized $1.50 per share dividend as a very important part of the Xcel Energy proposition for investors. We are committed to maintaining that dividend even as we move to acquire the NRG minority shareholder interest." (Consol. Compl at ¶ 107.) Xcel then assured analysts that "in bringing in NRG we have the chance to further have $0.05 accretion 2002 and approx. $0.10 thereafter while maintaining a very strong yield at $1.50 per share dividends." (Consol Compl. at ¶ 108.) In its March 2002, Registration Statement and Prospectus relating to its Xcel for NRG stock exchange, Xcel stated, "[a]s an Xcel Energy stockholder, you will receive Xcel Energy's dividend, which we currently expect to continue to pay at an annual rate of $1.50 per share for each Xcel Energy share you own." (Consol Compl. at ¶ 121.)

When making these statements about its commitment to the $1.50 dividend, Xcel did not disclose the risk posed by the cross default provisions. When Xcel finally revealed the cross default provisions, as NRG was slipping nearer to default, Xcel attempted to renegotiate its credit facilities with its lenders to eliminate the provisions. Among the concessions Xcel was forced make in exchange for the elimination of the cross default provisions was an agreement to review its dividend policy. (*See* Consol. Compl. at ¶ 166.) Xcel's directors ultimately cut the annual dividend in half, from $1.50 to $0.75. (*See* Consol. Compl. at ¶ 173.)

## DISCUSSION

### I. Standard on a Motion to Dismiss

Defendants Xcel, Howard, Brunetti, McIntyre, Pieper, Johnson and Kelly move to dismiss the consolidated complaint for failure to state a claim upon which relief may be granted under Fed.R.Civ.P. 12(b)(6) and failure to plead fraud in accordance with Fed.R.Civ.P. 9(b). Defendants Peterson, Bluhm and Goldberg also move to dismiss Counts III, IV and V pursuant to Fed.R.Civ.P. 12(b)(6).

On a motion to dismiss for failure to state a claim, the court typically must take the allegations in the complaint as true, view the complaint in the light most favorable to the plaintiff and dismiss the action " 'only if it is clear that no relief can be granted under any set of circumstances that could be proved consistent with the allegations.' " *Alexander v. Peffer,* 993 F.2d 1348, 1349 (8th Cir.1993) (quoting *Hishon v. King & Spalding,* 476 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a heightened pleading standard applies to section 10(b) securities fraud claims. *See* 15

U.S.C. § 78u–4(b). The court does not take as true every factual allegation in the complaint, but rather, it ignores "catch-all or blanket assertions" that fail to meet the particularity requirements of the Act. *In re: Navarre Corp. Securities Litig.*, 299 F.3d 735, 741 (8th Cir.2002) (internal quotations omitted). Nor does the court grant the facts alleged every possible reasonable inference, as it otherwise would, but instead, it searches the complaint for a strong inference of the requisite fraudulent state of mind. *See Florida State Bd. of Admin. v. Green Tree Financial Corp.*, 270 F.3d 645, 654 (8th Cir.2001).

## II. Count I: Chips Group's Securities Fraud Claim

In Count I of the consolidated complaint, the Chips group alleges securities fraud under § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b–5 of the regulations, 17 C.F.R. § 240.10b–5, against Xcel, Howard, Brunetti and McIntyre. The necessary elements of a securities fraud claim under section 10(b) and Rule 10b–5 include misrepresentation or omission of material fact, causation or reliance, damages and fraudulent activity in connection with the purchase or sale of a security. *See Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1533–34 (8th Cir.1996). Defendants' motion to dismiss asserts that the consolidated complaint fails to adequately plead the elements of materiality and fraudulent intent or scienter in connection with the purchase or sale of a security.

### A. Materiality

### 1. The Cross Default Provisions

■ Plaintiffs' claims focus primarily on defendants' failure to reveal the existence of the cross default provisions in Xcel's credit agreements. An undisclosed fact is material "if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as substantially altering the mix of information available to the investor." *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829 (8th Cir.2003). While materiality is generally a question of fact for the jury, a court may find the information in question so obviously insignificant that it is immaterial as a matter of law. *See Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir.1997). In all cases, "the question of materiality hinges on the circumstances of the company in question." *Gebhardt*, 335 F.3d at 829. Circumstances are rarely such that immateriality is obvious at the pleadings stage. *See id.* at 830. The heightened pleading standards established by the PSLRA do not apply to the issue of materiality. *See id.* at 830 n. 3. Therefore, the court takes as true the factual assertions in the complaint and grants the claims every reasonable inference. *See Alexander*, 993 F.2d at 1349.

Defendants Xcel, Brunetti and McIntyre issued numerous statements throughout the class period regarding NRG's credit and cash flow problems, the relationship between Xcel and NRG, ways in which Xcel might help with NRG's liquidity problems and the risks those problems posed to Xcel. (*See* Consol. Compl. at ¶¶ 94, 98, 100, 108, 115, 121, 125, 132–33, 140–42, 166.) Those subjects were of significant interest to reasonable investors and the cross default covenants were directly related to those concerns. Moreover, after the provisions were disclosed, several analysts commented on the relevance of the provisions. Finally, the reaction of the market to the eventual disclosure suggests that the existence of the cross default provisions was highly material. Considering the significance of the cross default provisions in the context of the total mix of information available to investors in Xcel during the class period, the court finds

that the complaint adequately pleads the element of materiality.[3]

## 2. The Round Trip Trades

■ Defendants contend that plaintiffs fail to show how information regarding one or more round trip trades involving Xcel's subsidiary PSCo that occurred in 1999 or 2000 would have been material to investors during the class period. Defendants note that, based on the trade specifically referenced in the consolidated complaint, the total impact of the wash sales on Xcel's revenue was less than three percent of Xcel's trading revenue that year and that energy trading was not the most significant aspect of Xcel's business. Defendants cite cases finding allegedly fraudulent acts that affected total revenue by less than ten percent to be immaterial as a matter of law.

Plaintiffs argue that Xcel itself was served with subpoenas in the investigations of the round trip trades and that a parent company may be deemed to have control over its wholly-owned subsidiary, especially where, as here, there are shared directors and officers and the subsidiary is a core business. Plaintiffs further allege that Xcel admitted to more than one round trip trade in 1999 and 2000 and that approximately half of PSCo's revenue in 1999 resulted from wash sales. (See Chips' Mem. in Opp'n to Defs.' Mot. to Dismiss at 31 n. 24.)

On a motion to dismiss under Fed. R.Civ.P. 12(b)(6), the court must consider the sufficiency of the claims as alleged in the complaint. See Alexander, 993 F.2d at

1349. As previously noted, the PSLRA's heightened specificity and particularity standards do not apply to the element of materiality. See Gebhardt, 335 F.3d at 830 n. 3. Here, the consolidated complaint sufficiently alleges that Xcel's SEC filings and press releases reporting significant growth in revenue from its trading subsidiaries were false and misleading because growth reported was based in large part on revenue from improper round trip trades. (See Consolidated Compl. at ¶¶ 74–78.) While defendants' citations are well taken, under the law in this circuit, the question is not how much revenue was misreported, but whether the undisclosed information would have been seen by a reasonable investor as affecting the total mix of information available. See Alpern, 84 F.3d at 1534 (citing TSC Industries, Inc., v. Northway, Inc., 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); Gebhardt, 335 F.3d at 829; contra Parnes, 122 F.3d at 547 (finding a two percent overstatement of assets immaterial as a matter of law on those facts). Because Xcel itself claimed that its trading business was an important part of its overall strategic plan, a reasonable investor could have seen improper trades and artificially inflated revenue as material matters. (See Consol. Compl. at ¶¶ 79–80). Therefore, the court does not find the failure to disclose the round trip trades to be immaterial as a matter of law.

## B. Scienter

■ To withstand a motion to dismiss, a securities fraud claim must also allege

---

**3.** The court notes that business conditions change over time and that the existence of the cross default provisions became more significant, that is, more material, as NRG's condition worsened. Defendants contend that they could not have known in November 2000, when Xcel entered its credit facilities, that the cross default provisions would come into play over eighteen months later. (See Xcel Defs.'

Mem. in Supp. of Mot. to Dismiss at 12–13.) However, the relevant factual question is whether the existence of the provisions would have been material to a reasonable buyer or seller of Xcel or NRG securities on or after January 31, 2001, and up until July 26, 2002. For the reasons indicated, that question is better left to a jury.

fraudulent activity in connection with the purchase or sale of a security. *See Alpern*, 84 F.3d at 1533. Under the PSLRA, plaintiffs bringing securities fraud claims must specifically allege scienter.[4] *See Navarre*, 299 F.3d at 741. Scienter is "the intent to deceive, manipulate or defraud." *Id.* The complaint must identify one or more false statements or omissions, indicate why such statements or omissions are misleading and allege with particularity sufficient facts to create a strong inference of scienter. *See* 15 U.S.C. § 78u–4(b)(1) and (2). To ascertain whether a strong inference of scienter has been pleaded, courts look for various "badges of fraud."[5] *Id.* at 745. A common indicator of scienter is motive coupled with opportunity. *See Florida State Bd. of Admin.*, 270 F.3d at 654–55 (quoting *Beck v. Manufacturers Hanover Trust*, 820 F.2d 46, 50 (2nd Cir. 1987)). When, as here, plaintiffs do not allege facts showing motive and opportunity, "other allegations [must be] particularly strong in order to meet the [PSLRA] standard." *Id.* at 660.

Plaintiffs may raise a strong inference of scienter by alleging facts indicating defendant's conduct was highly unreasonable and reckless. *See id.* at 654; *Alpern*, 84 F.3d at 1534 (quoting *Van Dyke v. Coburn Enterprises, Inc.*, 873 F.2d 1094, 1100 (8th Cir.1989) for the proposition that, " 'stated untrue facts with reckless disregard for their truth or falsity' " constitute scienter). To create a strong inference of scienter, reckless conduct must involve "an extreme departure from the standard of ordinary care ... that present[s] a danger of mis-

leading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *In re K-tel Int'l, Inc. Securities Litig.*, 300 F.3d 881, 893 (8th Cir.2002). One indicator of the standard of reasonable care can be found in the duty prescribed by § 10b–5 of the securities regulations. *See* 17 C.F.R. § 240.10b–5. Even where a party does not otherwise have an affirmative duty to disclose certain information, once a material topic has been broached, the party has an affirmative duty to disclose sufficient additional information to prevent the original disclosure from being misleading. *See* 17 C.F.R. § 240.10b–5.; *Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820, 831 (8th Cir. 2003).

The Chips group bases its claims on various affirmative statements made by a number of the individual defendants on behalf of Xcel, coupled with their failure to inform investors about the cross default provisions and round trip trades. Chips alleges that defendants' statements were inaccurate, unreasonable and reckless because defendants were aware of those facts and they knew that by not revealing the facts, their statements would mislead investors. Defendants claim that they were not obligated to disclose the cross default provisions because they could not have foreseen the provisions coming into play. They further contend that they were unaware of the round trip trades and reasonably relied on the financial reporting controls of their subsidiary, PSCo.

---

4. While not expressly included in the statute, scienter is an essential element of a securities fraud claim. *See Alpern*, 84 F.3d at 1534.

5. The *Navarre* court cites with approval the non-exhaustive list of examples found in *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir.2001). *See Navarre*, 299 F.3d at 745. Among the indicia mentioned in *Helwig* are

close proximity in time between an allegedly fraudulent misstatement or omission and a subsequent contradictory disclosure, a disregard of available factual information when a statement is made and disclosure of negative financial information in a way that would be understood only by highly sophisticated investors. *See Helwig*, 251 F.3d at 552.

Chips specifically cites a number of statements rendered inaccurate by defendants' omissions. In December 2001, as NRG's liquidity problems mounted, Brunetti discounted the risk to Xcel. (*See* Consol. Compl. at ¶ 94.) He did not comment on the cross default provisions or the risk they posed to Xcel's credit facilities. The following month, Xcel issued a press release specifically commenting on downgrades to NRG's credit and securities ratings and reassured the market that Xcel was committed to credit quality. (*See* Consol. Compl. at ¶ 98.) That same day McIntyre assured analysts that Xcel was not bound by any specific commitments of support to NRG's debt. (See Consol. Compl. at ¶ 100.) McIntyre did not inform the analysts that, while Xcel had not committed directly to NRG's debt, a default by NRG could put Xcel in default of its own credit agreements.

One month later, Xcel told analysts that if Xcel successfully reacquired outstanding NRG shares through its stock swap offering, NRG's debt would remain NRG's debt. (*See* Consol. Compl. at ¶ 108.) Once again Xcel asserted its separation from NRG, and it chose not to reveal the cross default provisions. Brunetti also stated that the reacquisition would help decrease NRG's dependence on external financing. (*See* Consol. Compl. at ¶ 133.) Brunetti did not mention the cross default provisions or inform the market that in the event of a downgrade of NRG's rating and cash collateral requirement, Xcel would itself be in default of its own credit facilities and thus be in no position to assist NRG.

In a Form 8–K statement issued in February 2002, Xcel specifically discussed the effects of a further downgrade of NRG's debt rating, including the possibility of a cash collateral requirement that was well beyond NRG's means. Xcel stated that should the cash collateral be required, it would be funded through NRG's available cash, revolving credit, cash from Xcel and possible further issuance of debt. (*See* Consol. Compl. at ¶ 115.) Again, Xcel did not reveal that, should NRG be unable to post the required cash collateral, Xcel's own credit facilities would be in serious jeopardy. Xcel made the same statements in its year end Form 10–K report. (*See* Consol. Compl. at ¶ 121.)

Finally, in response to analysts' concerns specifically about risks NRG declining condition posed for Xcel, Brunetti issued a press release in June 2002, stating that Xcel had ample liquidity under its existing lines of credit. (*See* Consol. Compl. at ¶ 142.) Brunetti did not reveal that Xcel's liquidity under its existing credit facilities was dependent upon NRG not defaulting on its debts.

Defendants argue that up until NRG debt was downgraded to junk status and its cash collateral agreements actually came into play, there was no reason for defendants to foresee the possibility that Xcel's cross default covenants would arise. They further assert that Xcel's senior officers did not have a "crystal ball to know that in the summer of 2002, this one loan provision would suddenly emerge as important. . . ." (Xcel Defs.' Mem. in Supp. of Mot. to Dismiss at 12.) They contend that it is not unreasonable, much less reckless, to omit disclosure of an unforeseeable event.

The court is not persuaded by defendants' assertions for two reasons. First, they do not address defendants' duty to give complete information on a subject once raised. *See Kushner,* 317 F.3d at 831. Many of defendants' statements were in response to specific concerns about the effect NRG's problems could have on Xcel. Xcel, Brunetti and McIntyre repeatedly emphasized certain aspects of the financial bonds between NRG and Xcel while remaining silent about the cross default pro-

visions. Second, defendants' assertion that their failure to disclose was not reckless because the trigger event, a downgrade of NRG's rating leading to a cash collateral requirement that NRG could not meet was not foreseeable, is untenable. While those circumstances may have appeared remote in November of 2000, the possibility became more likely with each passing month. The fact that the analysts, without knowledge of the cross default provisions, repeatedly questioned defendants about the interrelationship of Xcel and NRG and the risks posed to Xcel by NRG's deteriorating condition demonstrates that a crystal ball was not required to foresee that the cross default provisions might come into play.

Plaintiffs also allege that Xcel's failure to disclose the existence and possible impact of the cross default provisions was reckless and unreasonable in light of its promises of commitment to its historical dividend payment. (*See* Consol. Compl. at ¶¶ 80, 107–8, 121.)

■ Finally, plaintiffs assert that Xcel's failure to disclose the round trip trades was reckless in light of the corporation's statements regarding the importance of its trading subsidiaries to its overall business strategy. (*See* Consol. Compl. at ¶¶ 79, 83.)

The consolidated complaint sets forth numerous specific factual allegations creating a strong inference that non-disclosure of the cross default provisions and the round trip trades was an extreme depar-

ture from the standard of reasonable care and the duty not to mislead through partial disclosure. These include specific statements by Xcel and the individual defendants regarding the nature of Xcel's relationship with NRG, its commitment to the historical dividend and the importance of its energy trading components, each of which created a duty to disclose sufficient material information to create a complete picture. *See Kushner*, 317 F.3d at 831. The court finds that the Chips group has met its burden by pleading specific facts raising a strong inference of scienter.[6] Defendants' motion to dismiss Count I is therefore denied.

### III. Count II: Chips Group's Control Person Liability Claim

■ Section 20 of the Exchange Act extends liability for fraudulent conduct under Section 10(b) to individuals controlling persons found to have committed securities fraud. *See* 15 U.S.C. § 78t(a). The Xcel defendants base their motion to dismiss Count II on their belief that plaintiffs have failed to meet the PSLRA's pleading requirements for a § 10(b) claim. In order to make a prima facie claim under Section 20, plaintiffs must allege a primary violation of Section 10(b) and further allege control over the primary violator by the controlling person. *See Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir.1998). SEC regulations define control to include direct or indirect power over management and policies. *See* 17

---

**6.** The Xcel defendants additionally argue that plaintiffs failed to allege facts showing that defendants were or should have been aware of the round trip trades prior to Reliant's public disclosure. Defendants also assert that a parent company is not unreasonable or reckless in relying on its subsidiary's financial reports and internal controls, and for these reasons, plaintiffs fail to allege scienter with regard to the alleged non-disclosure of the wash sales. Plaintiffs counter that the SEC and CTFC investigations included subpoenas served on the parent, Xcel, not just PSCo. They further argue that a parent may be deemed to have control over and responsibility for a wholly-owned subsidiary, particularly where, as here, there are shared directors and officers and the subsidiary is a core business. Because the court finds a sufficiently strong inference of scienter in plaintiffs' other allegations, it need not address these arguments.

C.F.R. § 230.405. Whether a person is a controlling person for purposes of the statute and rules has been described as "an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir.1994).

Because the Chips group has met the pleading requirements for a § 10(b) claim and has sufficiently alleged that defendants Howard, Brunetti and McIntyre are controlling persons within the meaning of § 20, defendants' motion to dismiss is denied.

## IV. Count III, Catholic Workman's § 11 Claim

Catholic Workman alleges that defendants Howard, Peterson, Bluhm, Pieper, Johnson, Kelly and Goldberg violated § 11 of the Securities Act, which prohibits false or misleading statements in a securities Registration Statement or Prospectus. *See* 15 U.S.C. § 77k. Catholic Workman asserts that by omitting information about Xcel's cross default provisions, NRG's Registration Statement and Prospectus were false and misleading. Catholic Workman further asserts that the documents failed to indicate that the Senior Notes could be adversely affected by nega-

tive public information relating to Xcel.[7] Defendants argue that they were under no duty to disclose the terms of Xcel's credit agreements in an NRG debt issue and that there was nothing false or misleading about the Registration Statement and Prospectus as issued.

Section 11 imposes liability upon individuals responsible for material, false or misleading statements or omissions in registration documents. *See* 15 U.S.C. § 77k(a). Unlike securities fraud claims, § 11 claims are subject only to the notice pleading requirements of Fed.R.Civ.P. 8(a). Generally, to survive a motion to dismiss for failure to state a claim upon which relief may be granted, the complaint must allege a purchase of a security and a material misstatement or omission in the registration statement. *See In re: NationsMart Corp. Secur. Litig.*, 130 F.3d 309, 315 (8th Cir.1997). While the materiality inquiry under both § 10(b) and § 11 looks at the impact of the information on the total mix of information available, materiality may evolve over time under the fraud analysis. However, under § 11, the statements or omissions in the document in question either are or are not material at the time the document is issued.[8]

■ In spite of the liberalized notice pleading requirements, courts have grant-

7. The court notes that the most significant "negative public information relating to Xcel" that adversely affected the value of the NRG notes was NRG's own poor performance. Catholic Workman seems to turn the facts upside down, suggesting that it was Xcel's misfortunes that caused NRG's demise, or at least the drop in the value of the notes. However, as the NRG defendants point out, the cross default provisions, while they were in existence, induced Xcel to invest additional sums in NRG as Xcel attempted to avoid the collateral call and ultimate NRG default. While the covenants remained in Xcel's credit facilities, it continued to invest in NRG. After they were eliminated by the renegotiation of

the credit agreements, Xcel ceased infusing cash in NRG. (*See* Reply Mem. of Defs. Peterson, Bluhm and Goldberg in Supp. of Mot. to Dismiss at 1–2.)

8. Therefore, the court sees no contradiction in finding that the Xcel defendants' failure to disclose the cross default provisions was material in light of their other statements about Xcel and its relationship with NRG and finding the NRG defendants' non-disclosure of the details of Xcel's credit agreements in the NRG Registration Statement and Prospectus for NRG Senior Notes immaterial as a matter of law.

ed motions to dismiss § 11 claims when it is clear from the complaint and registration documents that the alleged misstatements or omissions are immaterial as a matter of law. *See, e.g., Gart v. Electroscope, Inc.,* 24 F.Supp.2d 969, 973 (D.Minn. 1998) (citing *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 546–48 (8th Cir.1997)). An omission in a Registration Statement or Prospectus is immaterial if the allegedly omitted information is obvious or when meaningful cautionary statements render the omission inconsequential in light of the total mix of information available. *See Parnes,* 122 F.3d at 547–48.

■ While the Registration Statement and Prospectus did not disclose the covenants in Xcel's credit agreements, the documents did discuss the relationship between Xcel and NRG, which was obvious in any event, given Xcel's controlling interest. (*See* Johnson Decl. Ex. D, NRG Prospectus at 8–9.) Further, the documents expressly warned that Xcel might not be a source of funds for NRG in the future.[9] (*See* Consol. Compl. at ¶ 216.) Catholic Workman's fundamental complaint is that the cross default provisions prevented Xcel from infusing additional funds in NRG. Yet the documents specifically noted that Xcel might not give NRG additional cash. "[C]autionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law" when it relates directly to the issue about

which plaintiffs allege they were misled. *Parnes,* 122 F.3d at 548. Therefore, the court finds that the alleged omissions are immaterial as a matter of law and defendants' motion to dismiss Count III is granted.

## V. Count IV, Catholic Workman's § 15 Claim

■ Catholic Workman alleges individual liability for securities fraud against defendants Peterson, Bluhm and Pieper. Under § 15 of the Securities Act, controlling persons may be held liable for violations of the, securities laws by persons under their control. *See* 15 U.S.C. § 77o. As with § 20 of the Exchange Act, a claim under § 15 requires an underlying primary violation of the securities laws.[10] The consolidated complaint does not allege violations by NRG itself and the court has dismissed Count III as to these defendants and Count V as to Peterson and Bluhm. Since there has been no primary securities law violation by a person controlled by these defendants and for which they may be held liable, Count VI is dismissed.

## VI. Count V, Catholic Workman's § 10(b) Fraud Claim

Catholic Workman alleges Section 10(b) securities fraud against Xcel and individual Xcel directors as well as four NRG officers or directors. Its claim against Xcel and the Xcel directors adopts and incorporates

9. The Prospectus stated that:

[w]e will require continued access to substantial debt and equity capital from outside sources....

\* \* \* \* \* \*

We cannot assure you that Xcel Energy will continue to provide additional equity capital to us or permit us to raise additional equity capital from others.

\* \* \* \* \* \*

"The substantial amount of debt that we have and the debt of our project subsidiar-

ies and project affiliates presents the risk that we might not generate sufficient cash to service our indebtedness, and that our leveraged capital structure could limit our ability to finance the acquisition and development of additional projects, to compete effectively, to operate successfully under adverse economic conditions and to fully implement our strategy."
(Consol. Compl. at 216.)

10. The statute holds liable a person who controls any person liable under §§ 11 or 12. *See* 15 U.S.C. § 77o.

all of the factual allegations made by the Chips Group. Therefore, as to Xcel and the individual Xcel defendants, Catholic Workman's allegations of scienter are the same. Its argument differs only in that it rests on the further assertion that based on defendants' incomplete and misleading statements, investors in the Senior Notes reasonably believed that Xcel would, and could, stand behind NRG and provide additional cash if necessary. It claims the statements on which it relied were misleading and fraudulent because Xcel did not disclose the cross default provisions or the fact that the provisions could prevent Xcel from providing cash to NRG and as a result, the value of NRG Senior Notes was artificially inflated.

### 1. The Xcel Defendants

■ The court finds Catholic Workman's securities fraud claim against the Xcel defendants too attenuated to withstand the scrutiny required by the PSLRA. *See* 15 U.S.C. § 78u–4(b); *Navarre*, 299 F.3d at 741. By adopting the allegations of the Chips group, Catholic Workman contends that a strong inference of fraud may be derived from the Xcel defendants' allegedly reckless and unreasonable failure to disclose material information it knew or should have known would have been important to a reasonable investor in NRG Senior Notes in light of the total mix of information available. Catholic Workman does not indicate the basis of a duty Xcel owed to NRG note holders. Nor does it make clear why the cross default provisions, which quite likely induced greater, rather than lesser, investment in NRG by Xcel, would have been of significance to NRG note holders before a default occurred. It was only in the case that NRG actually defaulted that the pro-

visions would prevent further funding by Xcel. Moreover, from its initial offering of the Senior Notes, NRG's Prospectus and Registration Statement clearly stated that note holders could not be assured of continued funding from Xcel. (*See* Consol. Compl. at 216.) Finally, Catholic Workman's assertion the companies were tied more closely than the Xcel defendants had let on, such that negative public information that adversely affected Xcel had a similar effect on NRG, is disingenuous given that the primary negative news affecting Xcel derived from NRG's own cash crisis. Because Catholic Workman has failed to make the showing of a strong inference of scienter required by the PSLRA, defendants' motion to dismiss Count V is granted as to Xcel, Howard, Brunetti, McIntyre, Johnson and Kelly.

### 2. The NRG Defendants

■ Catholic Workman's claim against individual NRG officers and directors Peterson, Bluhm, Pieper [11] and Goldberg asserts that each of these defendants was an NRG officer or director, each was aware of the close relationship between NRG and Xcel, each had access to information about the cross default provisions and each kept the provisions secret.

The court finds that the consolidated complaint does not allege sufficient facts showing that these defendants knew or should have known of the existence of the cross default provisions in the Xcel credit facilities. Plaintiffs' claim that Peterson, Bluhm, Pieper and Goldberg were "high-level executives" who "had access to information about the cross default provisions" is exactly the sort of "catch all or blanket assertion" the court must disregard under the PSLRA. *Florida State Bd. of Admin.,*

---

**11.** Pieper's motion to dismiss was brought together with the Xcel defendants. However, for purposes of clarity, the court discusses the his motion with that brought by the other NRG defendants.

270 F.3d at 660. These defendants were officers and directors of NRG, not Xcel, and plaintiffs have offered no specific facts indicating why they would or should have been aware of unique covenants in Xcel's credit facilities. While the close relationship between Xcel and NRG and the existence of certain common directors and officers may raise some inference that these defendants could have been aware of the cross default provisions, it falls well short of the strong inference required by the PSLRA. If Peterson, Bluhm, Pieper and Goldberg were not aware of the provisions, they could not have fraudulently concealed their existence. Therefore, defendants' motion to dismiss Count V of the complaint is granted as to defendants Peterson, Bluhm, Pieper and Goldberg.

### CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. The Xcel defendants' motion to dismiss [Docket No. 61] is granted in part and denied in part.[12]

2. The Xcel defendants' motion to dismiss [Docket No. 61] is denied as to Count I of the consolidated complaint.

3. The Xcel defendants' motion to dismiss [Docket No. 61] is denied as to Count II of the consolidated complaint.

4. The Xcel defendants' motion to dismiss [Docket No. 61] is granted as to Count V of the consolidated complaint. Catholic Workman's claim under Count V is dismissed with prejudice as to defendants Xcel, Howard, Brunetti, McIntyre, Pieper, Johnson and Kelly.

5. The NRG defendants' motion to dismiss [Docket No. 65] is granted. Catholic

Workman's claims under Counts III, IV and V are dismissed with prejudice.

12. The docket numbers recited herein refer to Master File, Civil 02–2677 (DSD/FLN).