873 F.2d 1094
 Blue Sky L. Rep. P 72,975, Fed. Sec. L. Rep. P 94,404
Les VAN DYKE, Ben Steensma, Larry Van Dyke, and Jim Reese, Appellants,
v.
COBURN ENTERPRISES, INC., James H. Coburn, Thomas M. Coburn,
Rose Ann Peterson, James M. Coburn, Roger
McKellips and State Bank of Alcester, Appellees.
 No. 88-5104.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 18, 1988.
Decided April 28, 1989.
Rehearing Denied June 5, 1989.
 
 Thomas K. Wilka, Sioux Falls, S.D., for appellants.
 Lawrence L. Piersol, Sioux Falls, S.D., and David C. Humphrey, Yankton, S.D., for appellees.
 Before HEANEY* and BEAM, Circuit Judges, and LARSON,** Senior District Judge.
 HEANEY, Senior Circuit Judge.
 
 
 1
 This action involves a securities transaction between a small South Dakota company, Coburn Enterprises, and four Minnesotans. After the deal went sour, the four Minnesotans brought an action against Coburn Enterprises, its shareholders, the State Bank of Alcester (Bank) and the Bank's president for violations of state and federal law. The district court directed a verdict against appellants on some claims and in favor of the Bank on its counterclaim, and the jury found against them on others and found for the Coburns on their counterclaim. The four Minnesotans appeal, raising a variety of issues, all of which are discussed in this opinion. We affirm as to all issues, other than the issue of whether prejudgment interest should be allowed the Coburns on their counterclaim; we reverse on that issue.
 
 I. BACKGROUND
 
 2
 The four Minnesotans (the appellants) were engaged in the businesses of farming, transporting, and raising and marketing artichokes. Through an organization known as American Energy Farm Systems (AEFS), which is a promoter of artichokes and a marketer of artichoke seeds, the appellants were directed to an alcohol fuels plant located at Sherman, South Dakota, owned by Coburn Enterprises, which, in turn, was owned by members of the Coburn family.
 
 
 3
 After the appellants expressed an interest in having the Coburn plant process their artichokes, the conversation turned to the possible investment by the appellants in Coburn Enterprises. One of the appellees, Jim Coburn, Sr., explained to the appellants that there had been an explosion at the plant and that the plant was not running because it lacked operating capital. The negotiations between the parties began in earnest near the end of September of 1982 when the parties met at the alcohol plant for four and one-half hours.
 
 
 4
 During this meeting, another of the appellees, Tom Coburn, gave the appellants a thorough tour of the plant and discussed the need for outside investors. Tom Coburn advised the appellants that the plant could produce anhydrous alcohol--197 proof or greater. The starting price was $450,000 for one-fourth share of Coburn Enterprises.
 
 
 5
 Some of the appellees then traveled to Minnesota to meet with the appellants. The appellants were advised at that time that the State Bank of Alcester, South Dakota, was servicing Coburn Enterprises' Farmers Home Administration (FmHA) loan. The Coburns asked the appellants to meet with the Bank president, Roger McKellips, who was a South Dakota state senator and a civic promoter of alcohol production.
 
 
 6
 At that meeting, McKellips stated that "alcohol was really booming" and that approximately $300,000 worth of tax credits were available for investing in the alcohol plant. McKellips asked the appellants if they were interested in purchasing stock in the plant and advised them that he believed that the Coburns would reduce the price.
 
 
 7
 The parties had several additional meetings and phone conversations. The appellants repeatedly asked if the plant would be able to produce anhydrous alcohol on a continual basis because they felt that the alcohol must be of that high of proof to be marketable. Both McKellips and the Coburns responded in the affirmative.
 
 
 8
 The negotiations continued for almost four months and culminated in the Stock Purchase Agreement. Prior to signing the agreement, the appellants met with both Coburn Enterprises' attorney, Allen Brown, and its accountant, Clair Wuebben. The appellants were provided with a substantial amount of information concerning Coburn Enterprises, including a financial statement from June 30, 1982, which stated that "the company has not commenced production [of anhydrous alcohol] beyond the testing stage and is currently in arrears on debt obligations."
 
 
 9
 The appellants were thus aware that Coburn Enterprises was in debt and badly needed working capital. Coburn Enterprises had defaulted on a $750,000 FmHA loan--ten percent of which was held by the Bank. They knew of an additional debt of $30,000, that Coburn Enterprises had defaulted on, also owed to the Bank. In addition, they knew that the alcohol plant had operated for only a short time before an explosion in November of 1981.
 
 
 10
 The appellants retained two independent counsels, two independent accountants and a banker to advise them concerning this investment and to review the Stock Purchase Agreement. The terms of the proposed Stock Purchase Agreement were extensively revised, primarily to the appellants' benefit.
 
 
 11
 As a result of the intense negotiations, the price was reduced from $400,000 for a one-fourth stake in Coburn Enterprises to $160,000 for a one-half interest in the plant. The appellants financed this investment by borrowing $160,000 from the Bank. The loan was partially secured by a $100,000 certificate of deposit (CD). In addition, the appellants jointly and severally executed the promissory note for the $160,000 loan.
 
 
 12
 Unfortunately, the alcohol plant could not continuously produce anhydrous alcohol. It could only produce alcohol at a proof significantly lower than 197. The company was unable to market the lower proof alcohol and became insolvent. The appellants defaulted on their loan from the State Bank of Alcester. The bank foreclosed on the $100,000 CD, but the balance of the loan was not paid.
 
 
 13
 The parties discussed the possibility of executing new notes that would split the remaining part of the appellants' liability under the original note. The appellants drew up new notes. The bank rejected these new notes because they lacked collateral.
 
 
 14
 The Bank began a state court action to collect the balance due on the loan. In response, the appellants filed this federal action alleging violations of both state and federal securities laws, common law fraud, breach of fiduciary duty, and violations of the federal RICO statutes. Near the time of trial, the Bank counterclaimed for the remainder of the promissory note, and the Coburns also counterclaimed for conversion of corporate assets and breach of contract. The trial court granted the appellees' motion for summary judgment on the RICO claims before trial. During trial, the district court directed verdicts in favor of the appellees on both the state and federal securities registration claims and in favor of the appellee Bank on its counterclaim for the balance due on the loan. The securities fraud claims and other remaining claims were then submitted to the jury, which resolved all claims in favor of the appellees. The jury also found in favor of appellee Coburn Enterprises on its conversion counterclaim.
 
 
 15
 II. REGISTRATION UNDER THE FEDERAL SECURITIES ACT OF 1933
 
 
 16
 The trial court directed a verdict against the appellants on their claim that this securities offering violated federal securities registration requirements. It concluded that the offering was a private offering and exempt from registration under section 4(2) of the Federal Securities Act of 1933, 15 U.S.C. Sec. 77d(2). Our standard of review under Federal Rule of Civil Procedure 50(a) is that a verdict must be directed if, under the governing law, there can be but one reasonable conclusion as to the verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed. Id. at 250-52, 106 S.Ct. at 2511-12.
 
 
 17
 The 1933 Securities Act is an attempt to provide a remedy for investment fraud and should be, therefore, liberally construed. Generally, registration is required, and the exemptions are limited by the statutory purpose. The design of the Act is to protect investors by promoting full disclosure of information thought necessary to make informed investment decisions. Thus, the applicability of the private offering exemption turns on whether the particular class of persons affected needs the protection of the Act. The burden of proof is on the issuer pleading the exemption--in this case, the appellees.
 
 
 18
 Section 4(2), the private offering exemption, exempts from registration "transactions by an issuer not involving any public offering." The determination of whether an offer is not public has not been relegated to a simple numerical test. See Securities & Exchange Com. v. Ralston Purina Co., 346 U.S. 119, 125, 73 S.Ct. 981, 984, 97 L.Ed. 1494 (1953). The question turns on the need of the offerees for the protections afforded by registration. Id. at 127, 73 S.Ct. at 985. If the offerees have access to such information, registration is unnecessary, and the section 4(2) exemption should apply. Id. If the offerees have a relationship with the offeror--such as employment, family or economic bargaining power--that enables the offerees to obtain all necessary information, the offering should also be exempt. Doran v. Petroleum Management Corp., 545 F.2d 893, 903 (5th Cir.1977).
 
 
 19
 Our review of this case leads us to the conclusion that the evidence is such that reasonable persons could only find that this offering was a private rather than a public offering. Initially there are at the outside only twelve potential offerees--the four appellants, the six Coburns, AEFS and a local realtor. As to the realtor, the evidence fails to show either that he was an offeree or that he ever actually offered the plant or stock in the plant to any third persons. As to the other offerees, none of them needed the protection of registration. To begin with, the six Coburns--assuming that they were offerees--had, as operators of the plant, full access to any information about the plant. AEFS also had special knowledge of the plant and operations due to its relationship as an artichoke supplier throughout the duration of the plant's existence and its special expertise in the area of alternative energy sources. In addition, the evidence shows that agents of AEFS made repeated inspections of the plant.
 
 
 20
 While reasonable minds may disagree as to whether the appellants had been furnished the necessary information to make an informed investment decision, it is without dispute that they had access to the necessary information. The appellants initially sought out the appellees. The negotiations were at arm's length. The appellants met several times with Coburn Enterprises' directors, accountant and attorney, and were never denied information. On the contrary, information was readily available, and it was suggested to the appellants several times to show the available information to an outside attorney and accountant.
 
 
 21
 Most importantly, the evidence shows that the appellants had the economic bargaining power to demand any information necessary to make an informed investment decision. The Coburns originally offered to sell the appellants' one-fourth share for over $400,000. Because of Coburn Enterprises' desperate need for investment capital and the fact that there were no other possible purchasers, the appellants were able to bargain the final terms down to $160,000 for one-half of the stock in the plant. Furthermore, this bargaining power is evidenced by the several modifications in the Stock Purchase Agreement including the modification indemnifying the appellants from any damages as a result of the explosion at the plant. Ultimately, the appellants had bargaining power, effectively enabling themselves the opportunity to obtain the same kind of information that the Act makes available in the form of a registration statement.
 
 III. REGISTRATION UNDER STATE LAW
 
 22
 The appellants argue that the trial court erred in directing a verdict in favor of the appellees on the state law registration issue. SDCL Sec. 47-31-9 provides that a security may not be offered for sale within the state of South Dakota unless that security is registered or is specifically exempt from registration. SDCL Sec. 47-31-82.1 exempts those securities sold to not more than five persons in South Dakota during a twelve-month period where there is no commission or remuneration for soliciting any prospective buyer in South Dakota. The appellants assert that this exemption does not apply to this offering for three reasons: (1) the Stock Purchase Agreement evidences six sales of securities to the six pre-existing Coburn shareholders in addition to the four sales to the appellants; (2) the exemption only applies to sales to five or less South Dakotans and not to sales to non-residents; and (3) the Coburn shareholders received remuneration under the Stock Purchase Agreement.
 
 
 23
 The appellants assert that the SDCL Sec. 47-31-82.1 exemption to state registration does not apply to this security because there were more than five purchasers within a twelve-month period as evidenced by the Stock Purchase Agreement. The argument assumes that paragraph two of the Agreement is a sale of a security. Paragraph two provides:
 
 
 24
 It is hereby understood and agreed that the present shareholders of Coburn Enterprises, Inc., mentioned aforesaid, have advances, loans and accrued wages owing to them by Coburn Enterprises, Inc. in the sum of $120,000.00. That Coburn Enterprises, Inc., shall draft and issue promissory notes to said present shareholders in the sum of $120,000.00 as payment for said advances, loans and accrued wages,....
 
 
 25
 The lower court notes that paragraph two was the result of the appellants' desire for indemnification for injuries caused by the explosion at the plant. The appellants thought that the recognition of the ownership of the corporation at the time of the accident would help protect them from liability as a result of the earlier explosion. Paragraph two of the agreement simply evidences the fact that members of the Coburn family were the owners of the corporation and that the transaction was not a new sale of securities. They had held this ownership since 1980--some time before the twelve-month period preceding this Stock Purchase Agreement signed on January 19, 1983. We conclude that these findings are not clearly erroneous.
 
 
 26
 The appellants also argue that this exemption applies only to sales to five persons residing in the state of South Dakota, rather than five sales made in the state. We disagree. The appellants' interpretation conflicts with South Dakota's general registration statute. SDCL Sec. 47-31-9 requires registration of all securities, unless exempt, "offered for sale or sold within the state of South Dakota." The intent of the South Dakota legislature, as expressed by the language of both provisions, is clear: if a sale to more than five persons is made in South Dakota, it is subject to registration unless it qualifies for one of the other exemptions. The appellants read the exemption as permitting certain sales to South Dakotans to be exempt while requiring full-scale registration if the purchaser resides outside of the state. It would be strange public policy indeed to give greater protection to non-residents than the protection afforded South Dakota residents.
 
 
 27
 The appellants' final argument against the application of this exemption is that the Coburn family received "remuneration" from the appellants' purchase of Coburn Enterprises. SDCL Sec. 47-31-82.1 applies only if "[n]o commission or remuneration is paid or given directly or indirectly for soliciting any prospective buyer in this state." The evidence shows, however, that appellants' capital was acquired to pay the interest on the FmHA loan and to provide working capital. There is no evidence showing that the Coburns received any proceeds from the stock sale as compensation for soliciting the appellants.
 
 
 28
 In sum, the trial court did not err in directing a verdict against the appellants because this offering was exempt from state registration requirements under SDCL Sec. 47-1-82.1.
 
 IV. 10b-5 SCIENTER REQUIREMENT
 
 29
 The appellants assert that Instructions 20 and 24 were given in error. Instruction 20 states the elements of a 10b-5 violation, including "that the defendant acted knowingly, as that term is defined in these instructions." Instruction 24 provides:
 
 
 30
 The plaintiffs, in order to recover on their 10b-5 claim, must show that the defendants acted knowingly, that is, with a mental state embracing intent to deceive, manipulate, or defraud. In order to establish this element the plaintiffs must prove by a preponderance of the evidence that the defendants stated material facts which they knew to be false or stated untrue facts with reckless disregard for their truth or falsity or knew of the existence of material facts which were not disclosed and they should have realized their significance in the making of an investment decision or knew of the existence of material facts which were not disclosed although they knew that knowledge of those facts would be necessary to make their other statements not misleading.
 
 
 31
 The Supreme Court in Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976), held that a finding of scienter--intent to deceive, manipulate, or defraud--is a prerequisite to Sec. 10(b) liability. Hochfelder clearly eliminates negligence as a possible basis for a finding of liability but leaves open the question whether recklessness could be sufficient under certain circumstances. Id. at 192-93 n. 12, 96 S.Ct. at 1381 n. 12. The majority rule in the Courts of Appeals is that recklessness satisfies this scienter requirement. See, e.g., Woods v. Barnett Bank, 765 F.2d 1004, 1010 (11th Cir.1985); Dirks v. S.E.C., 681 F.2d 824, 844-45 (D.C.Cir.1982), rev'd on other grounds, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); Sharp v. Coopers & Lybrand, 649 F.2d 175, 192 (3d Cir.1981), cert. denied, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982); Broad v. Rockwell International Corp., 642 F.2d 929, 961 (5th Cir.), cert. denied, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981); Nelson v. Serwold, 576 F.2d 1332, 1337 (9th Cir.), cert. denied, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978); Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 44-47 (2d Cir.), cert. denied, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1045 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). We agree with the majority of the circuits that Congress intended to create civil liability when one recklessly violates Sec. 10(b).
 
 
 32
 We do not agree, however, with appellants' contention that the trial court's instruction did not include recklessness. The plain language of Instruction 24 specifically stated that a knowing violation occurred if these defendants "stated untrue facts with reckless disregard for their truth or falsity." While a further definition of reckless might have been helpful, we cannot say, under these facts, that the appellants were prejudiced in any manner by the absence of such.
 
 
 33
 Since there is no underlying securities violation to which a controlling person claim would apply, we need not address the controlling person issue raised by the appellants.
 
 V. TESTIMONY BY JAMES HENDRICKS
 
 34
 The appellants claim that the lower court committed reversible error in deciding not to admit testimony by James Hendricks. Hendricks was a vice president and commercial loan officer of the State Bank of Alcester, and he serviced the appellants' loan. The district court refused to allow the appellants to call Hendricks in their case-in-chief because Hendricks was not listed in the pretrial disclosure. Although the lower court ruled that it may later permit Hendricks to be called on rebuttal if necessary, the judge subsequently ruled that Hendricks could not be called on rebuttal because his testimony would be cumulative and not proper rebuttal. In addition, the trial judge concluded that the two discrepancies between Hendricks' testimony and McKellips' testimony were minor and of insignificant impeachment value. If permitted, the appellants assert that Hendricks would have testified that the bank was too heavily involved in Coburn Enterprises, the plant would never run on a continuous basis while producing alcohol near 200 proof, and the FmHA start-up test was done under circumstances other than normal operations in order to impress the FmHA.
 
 
 35
 The trial judge has wide discretion in ruling on the admissibility of evidence, and his decisions are not to be disturbed by this Court unless there is a clear and prejudicial abuse. Haynes v. American Motors Corp. 691 F.2d 1268, 1272 (8th Cir.1982). As to not permitting the appellants to call Hendricks during their case-in-chief because the witness was not named in the pre-trial materials, the trial judge did not abuse his discretion. As to permitting Hendricks' testimony on rebuttal, the trial judge observed that this testimony pertained to matters that had been "rehashed and rehashed" and excluded the testimony under Rule 403. We agree.
 
 
 36
 VI. FALSE TESTIMONY OF TOM COBURN AND KEVIN ANDERSON
 
 
 37
 Following the verdict, the appellants moved for a new trial based on the false testimony of two of the appellees' witnesses. Appellants assert that the testimony of Tom Coburn and Kevin Anderson is contradicted by a report filed by Tom Coburn with the Bureau of Alcohol, Tobacco and Firearms, discovered after the parties had rested. We agree with the appellants that this evidence is material, but we find that the trial court committed no error in denying the motion for a new trial because the appellants failed to make a showing either that they exercised due diligence to obtain the report for trial or that this report probably would produce a different verdict at a new trial. See Rosebud Sioux Tribe v. A & P Steel Inc., 733 F.2d 509, 515 (8th Cir.1984).
 
 VII. CONVERSION COUNTERCLAIM
 A. Denial of Motion for JNOV
 
 38
 Following trial, the appellants made a motion for a JNOV. They argued that the evidence at trial did not support the jury verdict finding in favor of the appellees on their conversion counterclaim, the substance of which is that one of the appellants withdrew $100,000 from Coburn Enterprises' account and failed to return the full sum.
 
 
 39
 We find that the evidence at trial was sufficient to support the jury verdict in favor of the Coburns and, therefore, affirm the trial court. The evidence at trial showed the following:
 
 
 40
 Coburn Enterprises' account number before the January 19, 1983, Stock Purchase Agreement, which transferred 50% ownership of the corporation to the appellants, was 10-715-8, and at sometime around January 19th, the appellants opened a "Coburn Enterprises" account numbered 11-021-3 and deposited $160,000. This account was controlled by both the appellants and the Coburns.
 
 
 41
 On January 21, 1983, Jim Reese, one of the appellants, transferred $100,000 by counter check from account 11-021-3 to an account opened by him under his exclusive control as "Coburn Enterprises Account # 19-125-6." Reese had no authorization from Coburn Enterprises to make this transfer.
 
 
 42
 Clair Wuebben, Coburn Enterprises' accountant, testified that only $73,205 was returned and that $26,795 has not been returned to the corporation account number 11-021-3.
 
 B. Prejudgment Interest
 
 43
 Under SDCL Sec. 21-1-11 (prejudgment interest shall be recovered if damages are certain), the South Dakota Supreme Court has approved the award of prejudgment interest only in limited circumstances: when the exact amount of damages is known or readily ascertainable. See, e.g., Hanson v. Funk Seeds Int'l, 373 N.W.2d 30, 36 (S.D.1985). In this case, the jury, affirmed by the court, granted Coburn Enterprises prejudgment interest on its counterclaim. The appellants assert that the court erred.
 
 
 44
 Coburn Enterprises initially contended in their counterclaim that they were damaged in the amount of $35,000 for the conversion of funds from accounts at the State Bank of Alcester. The appellees further alleged that two of the appellants had purchased and sold grain and otherwise utilized funds from the bank for purposes unknown and unauthorized by the officers of the corporation. During trial, the appellees amended their theory of recovery to conform with the evidence of Coburn Enterprises' accountant. The accountant testified that one of the appellants transferred $100,000 from the one account to another and that only $73,205 had been returned. Thus, the appellees changed their claim from $35,000 to $26,795, and the jury found for the appellees for the amount of $26,795 plus prejudgment interest in the amount of $22,904.
 
 
 45
 This is a case where the amount of damages was uncertain until determined by the trier of fact. The proportional difference between the amount originally claimed and the amount eventually granted by the jury was substantial. The amount stated in the complaint appears to be an estimate, further demonstrating the uncertainty as to the amount of damages. This factual dispute continued through trial. The earliest the $26,795 figure came was two weeks before trial when the accountant first did a reconciliation of Coburn Enterprises' books. In addition, both McKellips' testimony and the Bank's statements show that all the money went into Coburn Enterprises' account rather than the account of one of the appellants. For these reasons, we reverse the district court and direct that court to grant appellants' motion for remittitur in the sum of $26,795.
 
 
 46
 VIII. BALANCE DUE ON THE LOAN: BANK'S COUNTERCLAIM
 
 
 47
 The appellants argue that the trial court erred in directing a verdict in favor of the Bank as to the Bank's counterclaim for the remaining $60,000 on the $160,000 loan to the appellants. They argue that the Bank is estopped from asserting this claim because the appellants were misled by material misrepresentations and that the district court erred because there remains a factual issue. According to the appellants, McKellips stated before the agreement and the note were signed that the plant would be worth the $60,000 portion of the note and that he would never look to the appellants if the plant did not work.
 
 
 48
 We agree with the trial court. The terms of the agreement with the Bank are patently clear. To permit this question to go to the jury on the basis of the evidence in this record would fully abrogate the parol evidence rule. The cases cited by the appellant fail to support such an abrogation. See Harmon v. Christy Lumber, Inc., 402 N.W.2d 690 (S.D.1987) (no written contract); Sander v. Wright, 394 N.W.2d 896 (S.D.1986) (not a contract action).
 
 
 49
 The appellants also argue that their liability for the remaining $60,000 should be based on new notes signed by the appellants after the Bank foreclosed on the $100,000 CD in 1984, rather than the original 1983 obligation. Their theory is that the 1983 note and the 1984 note were different obligations, and the 1984 note substituted for the 1983 note. Bank of Hoven v. Rausch, 382 N.W.2d 39 (S.D.1986). Their object is to avoid joint and several liability. The facts, however, do not support appellants' theory. Both parties proposed new notes, but there is no evidence to support appellant's argument that there was an agreement to either accept a new note in substitution for the old note or to modify the original obligation. As such, the appellants are jointly and severally liable under the old notes.
 
 IX. CONCLUSION
 
 50
 We affirm on all issues other than that of prejudgment interest. As to that issue, we reverse and remand to the district court with directions to enter an order consistent with this opinion.
 
 
 
 *
 The HONORABLE GERALD W. HEANEY assumed senior status on December 31, 1988
 
 
 **
 The HONORABLE EARL R. LARSON, United States Senior District Judge, for the District of Minnesota, sitting by designation