**In re STELLENT, INC. SECURITIES LITIGATION,**

**No. CIV.03–4384(RHK/AJB).**

United States District Court,
D. Minnesota.

July 23, 2004.

Reed R. Kathrein, Dennis J. Herman, and Maria V. Morris, Lerach Coughlin

Stoia & Robbins LLP, San Francisco, California; William S. Lerach, Lerach Coughlin Stoia & Robbins LLP, San Diego, California; Garrett D. Blanchfield, Jr., Reinhardt Wendorf & Blanchfield, St. Paul, Minnesota; Christopher Keller and Louis Gottlieb, Goodkind Labaton, Rudoff & Sucharow, New York, New York, for Plaintiffs.

Peter W. Carter, Heather J. Klaas, and Theresa M. Bevilacqua, Dorsey & Whitney, Minneapolis, Minnesota, for Defendants.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Since Congress overrode President Clinton's veto in December 1995 to enact the Private Securities Litigation Reform Act ("the Reform Act"), plaintiffs in private securities fraud cases have been required to allege both defendants' fraudulent acts and mental state with particularity. Investors in Stellent, Inc. ("Stellent"), a Minnesota-based software developer, have filed seven lawsuits in this District alleging corporate and individual malfeasance behind the company's stock-price collapse in early 2002. After the Court consolidated these actions, Plaintiffs filed an Amended Complaint accusing Stellent, Chairman of the Board Robert Olson, Chief Executive Officer Vern Hanzlik, and Chief Financial Officer Gregg Waldon (collectively, "Defendants") of artificially inflating Stellent's earnings through various sham transactions.

■■■ Defendants have moved to dismiss on the ground that the Amended Complaint does not comply with the Reform Act. Because the Act requires, in essence, detail, the question before the Court is one of degree: Are Plaintiffs' allegations, which minutely recount a conscious scheme to mislead investors about Stellent's revenues, detailed *enough* for the Reform Act? The Court finds that they are. Therefore, because the Amended Complaint alleges Defendants' fraudulent scheme and mental state with particularity, the Court will deny the motion.[1]

1. Defendants have submitted a phone-book sized stack of exhibits along with their motion papers. Plaintiffs have moved to strike on the ground that these materials stray from the four corners of the Amended Complaint. On a motion to dismiss, "[t]he court *may* consider, in addition to the pleadings, materials embraced by the pleadings and materials that are part of the public record." *In re K–tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 889 (8th Cir.2002) (emphasis added). Such consideration is a matter for the Court's discretion. *Kushner v. Beverly Enterprises*, 317 F.3d 820, 832 (8th Cir.2003). Here, this dispute turns out to be a tempest in a teapot. After examining the materials, they appear to have been submitted largely under the mistaken belief that the Court may resolve factual disputes in Defendants' favor on a motion to dismiss. This is simply not so. As the Eighth Circuit has made clear, a motion to dismiss is not a bench trial. Even in a securities action,

"[t]he strong-inference pleading standard does not license [the Court] to resolve disputed facts at this stage of the case." *Florida State Bd. of Admin. v. Green Tree*, 270 F.3d 645, 666 (8th Cir.2001); *see also In re K–Tel*, 300 F.3d at 889 n. 6 ("[W]e do not believe that *Green Tree* adopted [the Sixth Circuit's test of] 'the most plausible of competing inferences' as the law of this Circuit."). Although a few exhibits, such as SEC filings submitted to demonstrate the fact of disclosure, might be appropriate candidates for consideration, they have no bearing on the discussion that follows. Indeed, the entire submission does little more than kick up dust. After using the Court's ordinary discretion to exclude those documents used to generate factual disputes, submitted to prove the truth of the matter asserted, of an uncertain provenance, or plainly irrelevant (the vast majority), there is nothing left to strike. Plaintiffs' motion is therefore moot.

## Background [2]

Stellent is a NASDAQ-listed software company specializing in content-management solutions. (Am.Compl.¶ 2.) Formerly known as IntraNet Solutions, Inc., Stellent develops and licenses software programs designed to help commercial users manage electronic documents, post information to their websites, and transact business electronically. (*Id.*) Despite a general downturn in the software industry, the company posted nine straight quarters of pro forma profitability and revenue growth between April 1999 and July 2001.[3] (*Id.*)

On October 23, 2001, Stellent announced a tenth consecutive quarter of pro forma profitability. During a conference call with analysts, CEO Vern Hanzlik expressed his pleasure that the company had "maintained profitability despite a challenging environment." (*Id.* ¶ 50.) Gregg Walton, the CFO, echoed this sentiment, noting that Stellent had once again met analysts' expectations. (*Id.*)

> We continue to remain bullish in our pipeline which has continued to grow each and every quarter over the past several years, with the December 2001 quarter [expected to be] no exception. . . . Our guidance for the December 2001 quarter is to increase revenues from our September 2001 quarter of 23.2 million to approximately 25.0 million, which is slightly ahead of our revised consensus revenue estimates. Our guidance on our pro forma earnings per share, which includes pro forma taxes, is approximately 7 cents per share . . . .

(*Id.* ¶ 53.)

Despite this optimism, however, Stellent's sales pipeline was shrinking. (*Id.*

¶ 54.) As the next quarter drew to a close in December 2001, Stellent took several extraordinary measures to ensure that it would beat its own forecasts. First, its finance department booked the revenue from software sales immediately upon closing, but before the software could be shipped or implemented. (*Id.* ¶ 26.) This was directly contrary to Stellent's publicly stated practice of recognizing revenue "when evidence of a purchase arrangement exists, the product has been shipped and accepted by the customer, the fee is determinable and collectible, and no significant obligations remain related to implementation." (*Id.* ¶ 51.)

Second, Stellent loaned $3.5 million to Avantstar, a distributor founded by its close associates that same year. (*Id.* ¶ 40.) While Stellent had recently chosen Avantstar to distribute its Transit and Quick View Plus programs, Avantstar had few employees and little experience developing and distributing software. (*Id.*) Consequently, Stellent performed most of the work usually completed by its distributors, and a considerable portion of the $3.5 million went directly back to Stellent in the form of licensing fees or royalty payments. (*Id.* ¶¶ 40–41.) Avantstar repaid the loan several months later using short-term bridge funding provided by a venture-capital firm controlled by Robert Olson, Stellent's founder and Chairman. (*Id.* ¶ 92.)

Third, Stellent swapped software with another company to enhance its reported earnings. (*Id.* ¶ 44.) In December 2001, Stellent licensed $2 million of software to Software AG, which Stellent promptly

---

**2.** Within the confines of the Reform Act, the Court views the factual allegations as true and in the light most favorable to the plaintiff. *See, e.g., Kushner,* 317 F.3d at 824.

**3.** Pro forma figures, which include or exclude items at the company's discretion, often do not count items such as depreciation, goodwill, amortization, restructuring and merger costs, interest and taxes, losses at affiliates, and one-time expenses.

booked as revenue. (*Id.* ¶ 44.) At the same time, it agreed to purchase $2 million of Software AG's software. (*Id.*) In fact, neither company had any use for the other's software. (*Id.* ¶ 45.) To dispose of this software, the companies announced after the close of the quarter that they had entered into a reseller's agreement by which they would jointly market their software as a "bundled" package. (*Id.*)

Finally, three days before the quarter ended, Stellent granted an exclusive license to Active IQ, a Minnesota-based company in which Stellent, Hanzlik, Waldon, and Olson each had a stake. (*Id.* ¶ 30.) Stellent immediately booked $1.5 million as revenue earned in that quarter. (*Id.* ¶ 33.) In fact, the $1.5 million was merely a "pre-paid royalty" that Active IQ had agreed to pay over the three-year life of the license. (*Id.* ¶ 32.) Once the deal was consummated, Hanzlik, Waldon, and Olson liquidated their Active IQ holdings to avoid alerting investors of their interest in the related party. (*Id.* ¶ 34.) Stellent informed the SEC two months later that "[n]o officers and directors of the Company *have* an ownership or other financial interest in Active IQ." (*Id.* (emphasis added).)

On January 22, 2002, Stellent announced that it had once again exceeded analysts' expectations. For the quarter ending December 31, 2001, Stellent announced pro forma earnings of $26.6 million, a purported 36% increase over the same quarter the year before. (*Id.* ¶ 60.) It also announced pro forma net income of $1.7 million, or $0.07 per share—precisely the per-share income it had predicted three months before. (*Id.*) In a conference call with analysts, Waldon told investors that Stellent was "very pleased with being able to again meet the consensus estimates for revenue and pro forma earnings for voted share." (*Id.* ¶ 63.) During the conference call,

Stellent did not mention its booking practices, the software swap, or the Active IQ transaction. One analyst did inquire about $3.5 million in "pre-paid expenses"—i.e., the loan to Avantstar.

Q: Okay, and Gregg pre-paid expenses up another $3.5 million sequentially, can you give us a little color on what is driving that and the reason for that increase?

A: Yes Steve, the balance increased $3.5 million due to *certain short term investments in certain entities,* and I think the point to emphasize is the increase is not in prepaid expenses or other expenses that by their nature are randomly amortized through the income statement.

(*Id.* ¶ 65 (emphasis added).) The next day, Merrill Lynch reported that "[m]anagement's explanation is that it extended interest-bearing notes to smaller suppliers." (*Id.* ¶ 66.) Thomas Weisel Partners upgraded Stellent's stock to a "buy" following the conference call, stating that Stellent was the "only vendor in the space that is currently delivering meaningful earnings." (*Id.* ¶ 61.)

These earnings, however, quickly came under a cloud of suspicion. On February 7, 2002, the journalist Hank Greenberg partially revealed the Active IQ transaction in his column for TheStreet.com. (*Id.* ¶ 74.) As investors reacted, Stellent's stock lost more than 18% of its value over two days. (*Id.*) A week later, Stellent filed its Form 10–Q for the preceding quarter with the SEC, in which the company disclosed that it had booked revenues from a number of related parties.

We hold investments in eight non-public start-up technology companies, owning approximately 5% to 12% of these companies, and in one public technology company listed on Nasdaq, Active IQ, in which we own 8.5% . . . . The totals of all

these investments as of December 31, 2001 are approximately $6.4 million. . . . At December 31, 2001, the market value of our equity in Active IQ was approximately $1.9 million more than our investment value of $1.2 million. . . . During the three months ended December 31, 2001, the company recognized license revenue of $1.5 million with Active IQ, as we licensed our technology to them for use in certain ASP [Active Server Pages] vertical markets. At December 31, 2001, we had an accounts receivable balance from Active IQ of $1.0 million. We believe that the terms of this arrangement are comparable to those given to other companies. Our initial investment in Active IQ was made in the quarter ended December 31, 1999, with subsequent investment made through December 31, 2001. *No officers or directors of the Company have an ownership or other financial interest in Active IQ.* Revenue recognized for the nine months ended December 31, 2001 from our other related parties was approximately $0.175 million in the quarter ended June 30, 2001 and $0.225 million in the quarter ended September 30, 2001, of which all amounts have been collected.

(*Id.* ¶ 66 (emphasis added).) Stellent also obliquely reported its loan to Avantstar. "In December 2001, we entered into a note receivable transaction with one of our partners for $3.5 million. This note was 100% collateralized by all of the assets of the partner and by an unaffiliated accredited investor." (*Id.*)

Analysts were alarmed by these disclosures. Merrill Lynch stated that "[i]n light of the quarter's related party transactions we are concerned with our forward growth expectations." (*Id.* ¶ 78.) Fulcrum Investment Trust noted that the Company had significant investments in eight undisclosed companies, and noted

that the delay "makes us question management's credibility and the quality of STEL's earnings." (*Id.* ¶ 80.) Most significantly, Hank Greenberg published another column on TheStreet.com entitled "Stellent's Long List of Little Pals":

> Related parties *always* raise red flags. The more there are, and the *closer* the ties, the more you should wonder whether sales would've occurred if the relationships hadn't existed.
>
> Which brings us to Stellent (STEL:Nasdaq), the story of a company with relationships, some of which have the appearance of—shall we say—being too close for comfort. We're talking relationships with public companies and relationships with private companies, many of which, like Stellent, have headquarters in and around the Twin Cities, Minn.
>
> You almost need a scorecard to keep track of the players. And while one or two related-party dealings of this sort may raise eyebrows, looking at an entire string of them, involving various relationships with companies and insiders, paints a twisted tale that raises more questions about the company than it answers.

(*Id.* ¶ 84.)

On April 1, 2002, Stellent announced that would miss its predicted earnings for the first three months of 2002 by almost half—a $14 million shortfall on predicted earnings of $28 million. In analyzing this data, Merrill Lynch noted that Stellent had booked *no* related-party revenue during the preceding quarter.

> We previously indicated our concern that the related party transactions raise concerns regarding the health of the overall demand picture. We think the magnitude of this quarterly shortfall justifies our concerns. We think manage-

ment's limited disclosure following the December quarter earnings call was particularly troubling to investors in the wake of the Enron scandal, and severely pressured the stock.

(*Id.* ¶ 86.) On April 2, 2002, a chastened Hanzlik told the St. Paul Pioneer Press: "We're going to look at these deals, how we book them and how we negotiate terms with our customers. We're just going to be more conservative, more prudent on that." (*Id.* ¶ 87.)

This suit followed.

## Standard of Decision

Although allegations of fraud are generally subject to Federal Rule of Civil Procedure 9(b), certain aspects of private securities fraud cases fall under the heightened pleading standards of the Reform Act. Under the Reform Act, a complaint alleging securities fraud must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" respecting "each act or omission alleged to violate" the securities laws. 15 U.S.C. § 78u–4(b)(2). A complaint based on material misstatements or omissions must also "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *Id.* § 78u–4(b)(1). For allegations made on information and belief, "the complaint shall state with particularity all facts on which that belief is formed." *Id.*

■ On a motion to dismiss an action covered by the Reform Act, the Court still views factual allegations in the light most favorable to the plaintiff, *see Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 546 (8th Cir.1997), and assumes the truth of particularly pleaded allegations, *see Green Tree,* 270 F.3d at 666. The Court disregards " 'catch-all' or 'blanket' assertions," however. *Id.* at 660. Inferences regarding the

defendant's mental state survive "only if they are both reasonable and 'strong.' " *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 195–96 (1st Cir.1999). But "[t]he strong-inference pleading standard does not license [the Court] to resolve disputed facts [on a motion to dismiss]." *Green Tree,* 270 F.3d at 666.

## Analysis

Plaintiffs allege that Defendants violated Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Section 10(b)"), Securities and Exchange Commission ("SEC") Rule 10b–5, 17 C.F.R. § 240.10b–5 ("Rule 10b–5"), and Section 20(a) of the Exchange Act of 1934, 15 U.S.C. § 78t ("Section 20(a)"). Defendants have moved to dismiss on several grounds, including failure to comply with the Reform Act. The Court will begin its analysis with Section 10(b) and Rule 10b–5.

### I. Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b–5

■ Plaintiffs contend that Defendants violated Section 10(b) and Rule 10b–5 by artificially inflating the value of Stellent securities. Under Section 10(b), it is unlawful for any person, "directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe ...." 15 U.S.C. § 78j(b). Section 10(b) is not limited to a purchaser or seller of securities, but rather "reaches any deceptive device used 'in connection with the purchase or sale of any security.' " *Id.* (quoting 15 U.S.C. § 78j(b)).

■ Rule 10b–5, adopted by the SEC pursuant to its rule-making authority, states that "[i]t shall be unlawful for any person, directly or indirectly":

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Rule 10b–5 is coextensive in scope with Section 10(b). *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Central Bank of Denver, N.A. v. First Int'l Bank of Denver, N.A.*, 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

■■■■ To state a violation under Section 10(b) and Rule 10b–5, Plaintiffs must allege (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule, (2) causation, often analyzed in terms of materiality and reliance, (3) scienter on the part of Defendants, and (4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security. *In re K-tel*, 300 F.3d at 888. Both falsity and scienter must be alleged with particularity. *In re Navarre*, 299 F.3d at 743.

Plaintiffs claim that Defendants violated Rule 10b–5's three subsections by "employ[ing] devices, schemes, and artifices to defraud," making material false statements and omissions, and "engaging in acts, practices and a course of business ... to maintain artificially high market prices for Stellent securities." (Am. Compl.¶ 131.) Defendants argue that the Amended Complaint must be dismissed because it fails to plead the falsity of their statements or omissions with particularity,

does not give rise to a strong inference of scienter, and fails to allege that the challenged statements or omissions were material. The Court will address Defendants' arguments in turn.

## A. False or Misleading Statements and Omissions

■■■■ Defendants argue that the Amended Complaint does not allege that their statements were false with particularity. Under the Reform Act, a complaint based on statements or omissions must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). In essence, "[t]he plaintiff must specify each allegedly false statement—i.e., state the date, location and maker of the statement—and why the statement was false." *Pheiffer v. Goldman, Sachs & Co.*, 2003 WL 21505876, at *5 (S.D.N.Y. June 30, 2003) (citing 15 U.S.C. § 78u–4(b)(1) and *Acito v. IMC-ERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir. 1995)).

The Amended Complaint alleges that Defendants misled investors through a scheme to inflate Stellent's revenues. "The keystone ... [of this] allegation" is that Defendants' recognition of improper revenue "caused [Stellent] to appear to be earning more than it was." *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir.2003). While carrying a great many statements and omissions in its wake, this allegation most directly affects the January 22, 2002 earnings announcement and conference call. On that day, Stellent reported total revenue of $26.6 million and net income of $1.7 million—i.e.,

$0.07 per share. (Am.Compl.¶ 60.) In the announcement, Hanzlik stated that "[w]e grew our quarter-to-quarter license revenue by 20 percent and produced our eleventh straight quarter of profitability." (*Id.*) Likewise, Waldon stated in the conference call with analysts that Stellent was "very pleased with being able to again meet the consensus estimates [of $25 million and $0.07 a share] for revenue and pro forma earnings." (*Id.* ¶ 63.) In short, Defendants announced specific earnings and claimed to meet certain targets.

Plaintiffs allege that Stellent's earnings were misleading for at least four reasons. As alleged in the Amended Complaint,

(1) Defendants booked license revenue before it was earned in violation of Stellent's stated policy regarding revenue recognition;[4]

(2) Defendants channeled the bulk of a $3.5 million loan to its closely-affiliated distributor Avantstar into its own earnings in the form of license and royalty fees;

(3) Defendants recognized $1.5 million in "pre-paid royalt[ies]" from related-party Active IQ before the revenues were earned;[5] and

(4) Defendants padded Stellent's revenues through a $2 million software swap with Software AG.

(Am.Compl.¶¶ 26, 41, 33, 44.)

This alleges, in essence, that Defendants violated Generally Accepted Accounting Principles ("GAAP"). Under GAAP, revenues should "not [be] recognized until *earned,*" which usually occurs once "the product or merchandise is delivered." Financial Accounting Standards Board ("FASB") Statements of Concepts No. 5, ¶ 83(b) (emphasis added). Given the appropriate factual inferences, the booking of Active IQ royalties and the recognition of licensing revenue upon closing violated this principle. GAAP also requires that transactions "be accounted for in accordance with their substance rather than their form." SEC Accounting and Auditing Enforcement Release No. 817; *see also* FASB Statement of Concepts No. 2, ¶ 160 ("The quality of reliability and, in particular, representational faithfulness leaves no room for accounting representations that subordinate substance to form."). Again, seen in light of appropriate inferences, Defendants' decision to book the software swap with Software AG and the recycled loan to Avantstar as revenue does not comply with this requirement.

These allegations are sufficient to explain *why* Defendants statements regarding revenues were false or misleading. The Court "must assume the truth of the allegations pleaded with particularity in the complaint." *Green Tree*, 270 F.3d at 666. As alleged by Plaintiffs, "the nature of much of the alleged inaccuracy in earn-

4. Stellent's revenue recognition policy, as filed with the SEC, stated that revenue should only be recognized "when evidence of a purchase agreement exists, the product has been shipped and accepted by the customer, the fee is determinable and collectible, and no significant obligations remain related to implementation." (Am.Compl.¶ 51.)

5. Among the exhibits the Court has excluded is an affidavit by Active IQ's CFO submitted in connection with other litigation. Defendants rely on this document to argue that Active IQ actually paid Stellent at the time the revenue was recognized. But the affidavit is quite a bit more circumspect than that. It gives the date of the agreement and states the fact, but not the date, of payment. To the extent Defendants seek to have the Court infer that these events happened at the same time, that inference must break the other way on a motion to dismiss. *See Kushner*, 317 F.3d at 824. Regardless, as the Court has stated before, this is not a bench trial and the Court will not resolve disputed facts at this juncture. *See Green Tree*, 270 F.3d at 666.

ings derives from systematic fraud, described in detail," *In re Cabletron Systems, Inc.*, 311 F.3d 11, 35 (1st Cir.2002). Because these transactions, as alleged, fall outside the "range of 'reasonable' treatments" tolerated by GAAP, *K–Tel*, 300 F.3d at 890, the Court must presume Stellent's financial statements are "misleading and inaccurate." 17 C.F.R. § 210.4–01(a)(1). Plaintiffs have therefore alleged the falsity of the purported scheme in particular detail.

### B. Scienter

 Defendants also argue that the Amended Complaint does not raise a strong inference of scienter. While not explicitly required by the statute or the rule, a defendant's mental state is nonetheless "an acknowledged element of a § 10(b) or Rule 10b–5 claim." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1535 (8th Cir.1996). A plaintiff may establish scienter by demonstrating that the defendant made knowing or intentional statements designed "to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193, 96 S.Ct. 1375. "If the defendants 'stated untrue facts with reckless disregard for their truth or falsity,' there is scienter." *Alpern*, 84 F.3d at 1535 (8th Cir.1996) (quoting *Van Dyke v. Coburn Enterprises, Inc.*, 873 F.2d 1094, 1100 (8th Cir.1989)).

 Through the Reform Act, Congress raised the standard for pleading scienter. While a plaintiff in a private securities fraud case could previously aver the defendant's mental state generally, *see* Fed.R.Civ.P. 9(b), the Reform Act requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u–4(b)(2). Where the plaintiff challenges a forward-looking statement, the complaint must generate a strong inference that the state-

ment was made with "actual knowledge ... that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1). In essence, the complaint must "give [the Court] a strong reason to believe that there was a reckless or intentional wrongdoing." *In re Navarre*, 299 F.3d at 745.

 Defendants note, quite rightly, that alleged accounting chicanery does not usually satisfy the Reform Act. As the Eighth Circuit has held, "[a]llegations of GAAP violations are insufficient, standing alone, to raise an inference of scienter." *Navarre*, 299 F.3d at 745. This rule was established because GAAP are "far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions," but rather allow management to choose among "a range of 'reasonable' treatments." *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979). In some instances, however, allegations of GAAP violations may suggest a defendant's mental state when coupled with allegations of "corresponding fraudulent intent." *Chill v. General Elec. Co.*, 101 F.3d 263, 270 (2d Cir.1996); *accord Navarre*, 299 F.3d at 745. Such is the case here.

Plaintiffs provide two allegations that, if true, strongly suggest conscious misbehavior with regard to the larger scheme. First, Defendants purportedly concealed the ownership of Stellent's top management in Active IQ. As alleged in the Amended Complaint, both Stellent and the individual defendants held shares in Active IQ on the date of the license agreement. To avoid alerting investors, the individual defendants disgorged their shares after completing the transaction. Although Stellent partially disclosed this related-party revenue, it assiduously avoided mentioning the ownership stake its top management held at the relevant time:

During the three months ended December 31, 2001, the company recognized license revenue of $1.5 million with Active IQ, as we licensed our technology to them for use in certain ASP [Active Server Pages] vertical markets. At December 31, 2001, we had an accounts receivable balance from Active IQ of $1.0 million.... Our initial investment in Active IQ was made in the quarter ended December 31, 1999, with subsequent investment made through December 31, 2001. *No officers or directors of the Company have an ownership or other financial interest in Active IQ.*

(Am. Compl. ¶ 75 (emphases added).)

 Too clever by half, this statement entirely fails to disclose the "material fact necessary in order to make the statement[] made, in light of the circumstances under which [it was] made, not misleading." 17 C.F.R. § 240.10b–5. This statement is not only actionable in its own right, but also strongly suggests a conscious effort to conceal the incestuousness behind Stellent's earnings. Moreover, under the group pleading doctrine, the strong inference of scienter that this statement generates is attributable to each defendant individually. *See In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 142 (S.D.N.Y.1999) (Plaintiffs may "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.").

Second, Defendants allegedly misled investors and analysts regarding the Avantstar loan. During the January 22, 2002 conference call, Waldon—in Hanzlik's presence—answered a question regarding Stellent's surprisingly high "prepaid expenses":

[T]he balance [of prepaid expenses] increased $3.5 million due to *certain short term investments in certain entities,* and I think the point to emphasize is the increase is not in prepaid expenses or other expenses that by nature are randomly amortized through the income statement.

(Am. Compl. ¶ 65 (emphasis added).) This expenditure, as alleged, was actually a loan to Avantstar, Stellent's closely-affiliated distributor. By inflating the number of entities and investments, Waldon gave analysts the false impression of multiple investments distributed broadly, rather than a single loan recycled into earnings. If misdirection was Waldon's goal, his statement did the trick: Merrill Lynch reassured investors the next day that Stellent had merely "extended interest-bearing notes to smaller suppliers." (*Id.* ¶ 66.)

While Defendants obliquely disclosed the Avantstar transaction a month later, they did so in a way that raised significant questions. As Plaintiffs allege, Defendants reported that

In December 2001, we entered into a note receivable with one of our partners for $3.5 million. This note was 100% collateralized by all of the assets of the partner and by an unaffiliated accredited investor.

(*Id.* ¶ 75.) Defendants had quietly stepped back from Waldon's investments-and-entities comment. They had not, however, named either the loan recipient or the "unaffiliated accredited investor." In March 2002, Waldon dismissed reports identifying Avantstar as the loan recipient as "conjecture." (*Id.* ¶ 66.) To deflect further inquiry, Olson directed his investment company, Beartooth Capital, to provide Avantstar with a bridge loan to repay Stellent. Neither Avantstar's identity nor Olson's role in the financing were revealed until June 2002.

The Avanstar allegations, taken as true, provide strong indica of intentional wrongdoing. While these allegations most directly implicate Waldon, they also suggest conscious misbehavior by the other individual defendants. Given appropriate inferences, Waldon's misstatements, Hanzlik's acquiescence, and Olson's financing appear directed toward avoiding truthful disclosures likely to damage Stellent's stock price. Because their omissions are attributable to Stellent, *see Commerford v. Olson,* 794 F.2d 1319, 1323 (8th Cir.1986) (en banc), the Amended Complaint strongly suggests conscious wrongdoing on the part of all defendants. Plaintiffs have therefore coupled their GAAP allegations with the "corresponding fraudulent intent" required under the Reform Act.[6] *Navarre,* 299 F.3d at 745.

### C. Materiality

Finally, Defendants argue that they need not have disclosed more than they did because the omitted facts were not material. An omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (footnote omitted). This standard has been "expressly adopt[ed]" for claims arising under Rule 10b–5. *Basic v. Levinson,* 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). In general, "material-

ity depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Id.* at 240, 108 S.Ct. 978. Statements or omissions are not material where they "present or conceal such insignificant data that ... [they] would simply not matter to a reasonable investor." *Parnes,* 122 F.3d at 546.

Materiality is a question of fact. "Determination of whether a misrepresentation would have the effect of defrauding the market and inflating the stock price is a jury question. The trier of fact is uniquely competent to determine materiality, as that inquiry requires delicate assessments of inferences a reasonable investor would draw from a given set of facts." *In re Control Data Corp. Sec. Litig.,* 933 F.2d 616, 621 (8th Cir.1991) (citations and quotations omitted). "Where a reasonable investor could not have been swayed by an alleged misrepresentation, however, a court may determine, as a matter of law, that the alleged misrepresentation is immaterial." *Parnes,* 122 F.3d at 546.

The Amended Complaint alleges that Defendants inflated the market for Stellent securities by misrepresenting the company's earnings. "Accurate earnings figures are vital aspects of the 'total mix of information' which investors ... consult when evaluating [a company's] stock." *In re Cabletron,* 311 F.3d at 35. "Most investors would consider it significant, no mat-

---

**6.** The allegations that Defendants consciously misled investors are strong enough that the Court need not delve into the parties' motive and opportunity arguments. *See Green Tree,* 270 F.3d at 665 ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts ... suggesting that their public statements were materially inaccurate."); *see also Novak v. Kasaks,* 216

F.3d 300, 309–10 (2d Cir.2000) (courts "need not be wedded to [motive and opportunity] concepts"). Moreover, because the allegations in the Amended Complaint suggest that Defendants had actual knowledge of Stellent's skewed finances, they are sufficient—for purposes of this motion—to support the claims based on misleading forward-looking statements. *See* 15 U.S.C. § 78u–5(c)(1).

ter what the mix of information available, that a company was not earning as much as it was claiming to earn." *Gebhardt,* 335 F.3d at 830. Thus, "[t]he onus is on the defendants to demonstrate why this assumption should not stand." *Id.*

Defendants try to unseat this assumption in three ways. First, they argue that the challenged amounts are immaterial as a matter of law. Second, they contend that they were not under a duty to disclose more, or at a different time, than they did. Third, they argue that the market was already aware of the omitted information. These contentions, however, do not reverse the common-sense presumption that accurate earnings information is meaningful and important to investors.

 First, the sums involved were material. In general, "the quantity of a revenue overstatement, in and of itself, is not ... dispositive" of materiality. *Gebhardt,* 335 F.3d at 830. Rather, the Court must place the inflated revenue in context. "In order to take this decision away from the jury, the circumstances must make it obvious why a reasonable investor would not be concerned about the facts misrepresented." *Id.* While Stellent is correct that each challenged transaction made up only a small portion of the company's annual revenues, the relevant context is quarterly earnings. Seen in this light, the alleged improprieties affected up to $7 million dollars against reported revenues of $26.6 million. Facts regarding these transactions, which affected more than 25% of earnings, would be highly relevant to any investor. Indeed, judging by the market reaction once facts began to leak, a great many investors found them so. *See No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 949 (9th Cir. 2003) ("[T]he fact that a firm's stock price ... significantly change[s] [upon the re-lease of information] is strong evidence of materiality.").

 Second, Defendants were required to disclose the information omitted. "When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). But "[i]f one speaks, he must speak the whole truth." *Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1331 (7th Cir.1995). Thus, having chosen, for instance, to announce Stellent's earnings on January 22, 2002, Defendants were obliged to "make the full disclosure of known facts necessary to avoid making such statements misleading." *Panter v. Marshall Field & Co.,* 646 F.2d 271, 292 (7th Cir.1981). Likewise, having asserted that its officers and directors *have* no stake in Active IQ, Defendants were required to disclose they *had* an interest on the date of the transaction. In each instance, "[t]he central issue ... is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor." *McMahan & Co. v. Wherehouse Entm't, Inc.,* 900 F.2d 576, 579 (2d Cir.1990). By speaking about material facts, Defendants created a duty to speak fully.

 Finally, it is far too early to assess the market's awareness of the alleged omissions. Defendants assert that the market already knew about both the Active IQ transaction and the individual defendants' personal stake in it. This asserts, in essence, the truth-on-the-market defense. Through this defense, a defendant may rebut the fraud-on-the-market presumption of reliance by proving that "the 'market makers' were privy to the truth." *Basic,* 485 U.S. at 248, 108 S.Ct. 978. But this defense is "intensely fact-specific" and "rarely an appropriate basis

for [dismissal]." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir.2000). To establish truth on the market, Defendants must show, for instance, that material omissions were "transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir.1989). Defendants have not, and probably cannot, meet that burden at this stage of the litigation. Indeed, it is a notoriously difficult burden to carry short of trial. *See In re Columbia Sec. Litig.*, 155 F.R.D. 466, 482–83 (S.D.N.Y.1994) ("[D]efendants' burden [of establishing the truth on the market defense is] extremely difficult, perhaps impossible, to meet at the summary judgment stage.").

■ In sum, Defendants have not rebutted the presumption of materiality that attaches when "a company was not earning as much as it was claiming to earn." *Gebhardt*, 335 F.3d at 830. Because "[a]ccurate earnings figures are vital" to investors, the alleged statements and omissions regarding Stellent's earnings and the transactions they were based upon would be material to a reasonable investor. *In re Cabletron*, 311 F.3d at 35. Plaintiffs may therefore proceed on their claim under Section 10(b) and Rule 10b–5.[7]

## II. Section 20(a) of the Exchange Act of 1934

■ Plaintiffs have also alleged that Defendants were "controlling persons" under Section 20(a) of the Exchange Act of 1934. Section 20(a) imposes liability upon persons that control violators of, among other things, Section 10(b) and Rule 10b–5:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as the controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To establish a prima facie case of control-person liability, a plaintiff must allege "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (internal quotation omitted). Defendants' sole argument here is that Plaintiffs' claim under Section 10(b) and Rule 10b–5 is defective. Because that claim is viable, the Court will deny the motion as to Section 20(a).

## Conclusion

In sum, the Amended Complaint complies with the rules that control pleading in

---

7. In their reply papers, Defendants suggest that Plaintiffs have not pleaded loss causation. This, to the Court's way of thinking, is an odd argument. The entire Amended Complaint is premised on the allegation that Stellent's stock price plummeted as the truth about the company's dubious transactions became known. This is loss causation, classically pleaded, and does not require the company to have restated revenues. *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir.2002) ("[T]he fact that the financial statements for the year in question were not restated does not end Aldridge's case when he has otherwise met the pleading requirements of the [the Reform Act]. To hold otherwise would shift to accountants the responsibility that belongs to the courts. It would also allow officers and directors of a corporation to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements.").

private securities fraud cases. Plaintiffs have alleged in abundant detail how Defendants used sham transactions to pad Stellent's earnings. In the most damaging accusations, Defendants avoided closer scrutiny of Stellent's books by hiding relevant red flags such as transactions between related and closely-affiliated parties. While there is nothing intrinsically wrong with transactions of this type, they matter to investors because they suggest a closer look at the books. Upon issuance of this Order, Plaintiffs will get that look. The stay of discovery will be lifted and both sides will have the opportunity to obtain documents and depose witnesses. After all, the Amended Complaint is only an accusation. Perhaps it is true; perhaps not. We'll see.

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED**:

1. Defendants' Motion to Dismiss (Doc. No. 40) is **DENIED**;

2. Plaintiffs' Motion to Strike (Doc. No. 45), is **DENIED AS MOOT**.